**In the Interest of P\_\_\_ A\_\_\_ M\_\_\_, a minor, under 17 years of age.**

**No. WD 30840.**

Missouri Court of Appeals, Western District.

Oct. 1, 1980.

Roy W. Brown, Brown & Brown, Kansas City, for appellant--minor.

Roger Wall, Asst. Public Defender, Kansas City, guardian ad litem for minor.

James F. Ralls, Rachel Hall Whipple, Juvenile Court Services, Kansas City, for respondent.

Before KENNEDY, P. J., and PRITCHARD and SWOFFORD, JJ.

SWOFFORD, Judge.

This case was tried below upon a second amended petition alleging that the minor, P____ A____ M____, fourteen (14) years of age, was in need of the services, care and treatment of the Juvenile Court of Jackson County, Missouri in that "on or about October 3, 1978, in Jackson County, Missouri, the child, acting alone or knowingly in concert with others, did commit an act that would be a crime if the child were an adult". This charge was based upon the death of her father, as hereafter related, with reference made to the capital murder statutes.

The Juvenile authorities also filed a motion to dismiss the petition so as to allow prosecution under the general law. However, the Prosecuting Attorney of Jackson County wrote a letter (which was received in evidence as Juvenile's Exhibit No. 1 without objection) declining to prosecute under the general law even in the event the Juvenile Court waived jurisdiction and dismissed the proceedings there. In the light of this, the Juvenile authorities were permitted (also without objection from the minor's counsel) to withdraw the request for waiver and the motion to dismiss. The matter proceeded to trial in the Juvenile Division on February 28, 1979, at which time the minor was 1½ months short of her fifteenth (15th) birthday. The minor was present in person and was represented by a duly appointed guardian ad litem and also counsel retained by her mother, Mrs. M____.

Before the trial commenced, counsel for the minor filed a written request for a jury trial, which the court denied, and the trial proceeded as a bench–tried case. At the conclusion of the evidence, the court entered a judgment finding jurisdiction; that the petition be sustained; that the juvenile was in need of care and treatment; and committing her for an indeterminate period to the Director of Juvenile Services for placement in the Hilltop School for Girls until further order of the court. The judgment also spelled out certain directions, restrictions and special conditions as to the minor's confinement and care.

The petition upon which this matter was heard stated that the minor:

" * * * is in need of the care, treatment and services of the court because:

On or about October 3, 1978, in Jackson County, Missouri, the child, acting alone or knowingly in concert with others, did commit an act that would be a crime if the child were an adult, in that said child did unlawfully, wilfully, knowingly, feloniously, deliberately and with premeditation, kill J____ H____ M____ by striking him in the head with a pipe, in violation of Sections 565.001 and 565.008 R.S.Mo. (1977).

WHEREFORE, petitioner prays the court to sustain this petition and to order appropriate supervision, care, examination, treatment, detention, placement, commitment, change of custody, or other disposition of said child as provided under provisions of Chapter 211 R.S.Mo., as amended."

At the outset of the hearing the above allegations were orally denied by counsel for the juvenile. The hearing proceeded with the results above noted. After an unavailing motion for a new trial or, in the alternative, motion for a judgment of acquittal, this appeal followed.

The appellant (minor) raises two assignments of error.

*First*, appellant claims that the court erred as a matter of law in sustaining the petition because the credible evidence merely indicated that the minor was an "accessory after the fact" of her father's murder and thus there was no credible evidence beyond a reasonable doubt to sustain the petition.

*Second*, the appellant asserts that she was wrongfully denied a jury trial of the cause "by the State's failure to proceed with the certification" and she was thus denied her constitutional right of due process of law guaranteed by the Federal and State Constitutions.

These points on this appeal must be considered and decided only against the background and in the context of the statutes,

rules and decisions pertinent to the facts and procedures of this case. Some general considerations must be kept in mind.

The legislative enactments are part of Title XII of the statutes governing Public Health and Welfare. Chapter 211 of that title deals with "Neglected and Delinquent Children" and since 1957 is commonly known as the Juvenile Code. In 1975, effective August 1, 1976, the Supreme Court adopted a comprehensive "Rules of Practice and Procedure in Juvenile Court", Rules 110 to 128 inclusive. It is the pertinent provisions of those statutes and rules in the light of judicial precedent which must govern the decision of the instant case.

Before the fragmented statutes dealing with juveniles and juvenile courts were codified in 1957, the emphasis was placed in the type of case now under consideration upon the element of delinquency necessarily involved. But gradually both the Legislature and the courts became more aware of the multitude of problems of great national concern involving children. A salutary result of this trend has been the slow but steady increase in the protection of children's personal rights such as due process and the goal of fundamental fairness in all proceedings involving minors, without sacrifice of the welfare and protection of society generally. Modern law seeks to attain a balance between the interests of the child and of society; sometimes, it must be conceded, with discouraging results.

The Juvenile Code of Missouri expresses this broad and inclusive objective in Section 211.011 R.S.Mo.1978 (Laws 1957) where it is stated that the purpose of the Juvenile Code "is to facilitate the *care*, protection and *discipline* of children who come within the jurisdiction of the juvenile court" to the end that each child "shall receive such care, *guidance* and *control*" as will "conduce to the *child's welfare* and the *best interests of the state* * * *" (Emphasis in quotes supplied).

Section 211.031 RSMo 1978 (as amended Laws 1976) grants the Juvenile Court exclusive original jurisdiction in certain classes of proceedings. Among such classes are:

situations where it is shown that "[T]he behavior, environment or associations of the child are injurious to his welfare or to the welfare of others", Sec. 211.031.1(1)(c); it is alleged that a child prior to reaching 17 years of age has violated a state law, Sec. 211.031.1(2); and, "[F]or the commitment of a child to the guardianship of the department of social services as provided by law", Sec. 211.031.1(5).

■ The Juvenile Code is a complete statutory method for disposition of the areas specified therein. It is *sui generis*. *In re Interest of Ronald C.* ___, 314 S.W.2d 756, 759[3] (Mo.App.1958) and cases collected in Footnote 3; *State v. Harold*, 271 S.W.2d 527, 529[5–7] (Mo.1954); *State v. Heath*, 181 S.W.2d 517, 519[4] (Mo.1944). Proceedings of the nature of the instant case are neither criminal nor penal in nature in the sense that the State seeks to impose punishment for the commission of a crime. In fact, the Code is basically calculated to disassociate juvenile cases from criminal cases as far as practical. As was said in *State v. Harold*, supra, at l.c. 529:

" * * * Among its purposes is the safeguarding of children from criminal prosecutions and the effecting of their reformation by training them morally, mentally and physically, the State assuming supervision of the child for the performance of parental duties. * * *"

See also: *J. D. H. v. Juvenile Court of St. Louis County*, 508 S.W.2d 497, 500[1] (Mo. banc 1974).

■ This philosophy is in keeping with the requirement of the Juvenile Code, Section 211.031 RSMo 1978, which gives the Juvenile Court exclusive original jurisdiction where it is alleged that a child within the county is "in need of care and treatment". While these proceedings are generally governed as to practice and procedure as in equity, where, as here, the basis upon which this jurisdiction is invoked rests upon the alleged commission of a felony, the burden is upon the petitioner to prove that fact beyond a reasonable doubt. *In the Matter of Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368; Rule 117.05(a). Where, as

here, the Juvenile Court after hearing the proof makes a specific finding "beyond a reasonable doubt" that the child did commit the felony alleged and sustains the petition, this Court treats such finding and judgment "as equivalent to a jury verdict" and this Court only considers "the evidence and the inferences to be drawn therefrom in the light most favorable thereto" *In re Fisher*, 468 S.W.2d 198 at l.c. 199–200[1] (Mo.1971). In a proceeding of the nature of the present case, the Juvenile Court is the trier of the facts, weighs the evidence, judges the credibility of the witnesses, and either sustains or denies the petition. The scope of appellate review in this case must be confined in scope by the formula expressed in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976) and Rule 73.01.

Appellant's Point I and her argument in support thereof appears to be based upon the premise that the alleged capital murder set forth in the petition was supported by "no credible evidence" but rather the credible evidence merely indicated that the juvenile was an "accessory after the fact" and therefore the court erred as a matter of law in sustaining the petition. The minor cites *French v. Tri–Continental Leasing Corporation*, 545 S.W.2d 345 (Mo.App.1976), an action involving a claim for return of down–payment on a lease, which is inapposite to the case at bar, and she also relies upon *Murphy v. Carron*, supra, and Rule 73.01(3), which undoubtedly govern the scope of this review. It should be here noted that Point I is not based upon lack of statutory notice to the juvenile as to the conduct alleged against her as the basis for jurisdiction of the Juvenile Court. She asserts only that there was a complete lack of any credible evidence that she acted either as a principal or in concert with another in the murder of her father so as to justify the court's finding and judgment.

This position, gleaned from her brief, is based upon conflicts between her account of the incidents shown preceding the homicide and the facts surrounding the homicide and that of the testimony of the witnesses for the petitioner. That such a conflict appears is obvious because testifying in her own behalf she categorically denied substantially all of the facts upon which the petitioner's case depended. Of course, the credibility of the witnesses was for the trier of the facts, the trial court.

Though reluctant to do so, this Court feels it necessary to summarize the facts in evidence which strongly support the trial court's conclusions and judgment.

██ The child had lived alone with her natural father for some time in Kansas City, Missouri prior to October 3, 1978. The whereabouts of her natural mother, I___ M___, does not appear in the record, except that she had retained counsel for her daughter, was present at the trial (but did not testify) and the court ordered an investigation to be made of Mrs. M___ as her situation might affect the juvenile's care while under Juvenile Court custody following the judgment. At the time of these tragic events, the child was 14 years of age and was attending high school, although there was evidence that she was having truancy problems with the school authorities, which may have resulted in suspension and which led to problems with and punishment from her father. The child testified that upon occasion her father had physically punished her.

A young man, B___ G___, who had known the juvenile at school, testified that a week or two before October 3, 1978, he had been visiting with the juvenile and she had asked him "which way would be the best way to kill somebody?". He stated that "I told her hit him in the back of the head with a hammer". The witness stated that she "acted like she was joking".

Another young man, R___ L___ W___, a neighbor of the M___s, testified that around 3:00 p. m. on October 3, 1978, he was working on his car in his driveway and that P___ A___ M___ came to where he was working and asked him if he had a pipe. She was with a young man whom he knew only as "J. R.", but with whom he was not otherwise acquainted. He showed her a small piece of plumbing pipe and she said "No", it was too small. He located another

larger and heavier piece of scrap plumbing pipe made of galvanized steel and gave it to her. Although he asked her, she made no explanation as to why she wanted the pipe. He testified that the pipe found at the murder scene (Exhibit No. 10) was possibly the same pipe and seemed to be about the same weight.

G___ B___ was called by the petitioner. At the time of his testimony, he had previously pleaded guilty to his participating in the murder of Mr. M___ and was confined to McCune Home for Boys. He stated that on October 2, 1978, the juvenile had asked him if he would kill her dad. He said "No". She looked to him like she was "playing".

He testified that on October 3, 1978, he met the juvenile outside the high school she had been attending and that she was skipping her classes. (The school records show that she was absent that day only her last hour, and much was made of this conflict in the juvenile's brief). He stated that he and the juvenile hung around the vicinity of the school and smoked pot. When they were getting "stoned", she asked him again if he would kill her dad. Again he said "No". Later, she asked him for the third time, "Do you want to kill my Dad for me?" This time, he answered "Yes".

At this time, G___ B___ was on Juvenile Court probation for truancy. He also was 14 years of age.

G___ B___ further testified that he and the juvenile caught her regular school bus and got off about 2 blocks from her home, and they went to some "guy's" house where she obtained a piece of pipe. They then went to the M___ home where he sat in the living room watching TV until he saw Mr. M___ pull into the driveway, and he told the girl her father was home and then jumped behind the door, pipe in hand. When Mr. M___ walked into the house, the witness struck him in the back of the head; Mr. M___ fell to his knees, and, the witness struck him again. He stated he struck M___ as hard as he could. Witness then went to the bedroom where the juvenile was; she said she heard her father moving around; took the pipe and, "She went in

there and hit him". Witness did not actually see her hit her father, but he heard Mr. M___'s head hit the floor. The witness stated that the juvenile then handed him the car keys and told him to go wait in her father's car. He took no money from Mr. M___ nor did he see the girl do so. G___ B___ had never met Mr. M___ before, and struck him at the juvenile's request. Mr. M___ had never done anything to him.

G___ B___ stated that after he had waited in the car for 4–5 minutes, the juvenile came out of the house and told him to drive her to her boyfriend's house, she would direct him. While en route, he sideswiped another car and then ran into a utility pole. Both he and the juvenile then fled the scene. Shortly, they were apprehended by the police and were taken to Children's Mercy Hospital, from which which they were released after X–rays. G___ B___'s mother picked him up at the hospital and the last he saw of the juvenile, she was leaving the hospital on foot.

Following October 3, 1978, the juvenile stayed at the homes of various friends and G___ B___ remained at his parents' home. They were both arrested a week later, October 10, 1978, and this proceeding followed.

The events during that week, as established by the testimony, were that when no activities were observed by a neighbor, R___ B___, at the M___ home, and the newspapers were accumulating, he became concerned. Later, a large number of flies were observed around the windows. The police were alerted, and upon entry into the M___ home, they found Mr. M___'s body lying on the floor between the kitchen and the living room and partially covered by a quilt or blanket. There was a large quantity of blood and what appeared to be brain tissue on the floor; an iron pipe was near the body; and, later examination revealed that there were hairs matching those from Mr. M___'s head stuck to the pipe. No usable fingerprints were recovered from the pipe, but a fingerprint of G___ B___'s was lifted from the entrance to the bathroom. Mr. M___'s death was caused by massive head wounds.

In her testimony, the juvenile categorically denied that she had ever asked anyone to kill her father; that she had obtained the pipe from R____ W____; and that she had struck her father or participated in the attack which resulted in his death. Thus, she placed her testimony in abrupt and diametric conflict with that of witnesses B____ G____, R____ L____ W____ and G____ B____ upon the basic factual issues. These conflicts and the conflicts which emerged from her testimony and evidence on lesser details, such as, her activities with G____ B____ and in reference to the number of classes she skipped on the day of October 3, 1978, were for the trial court to weigh and resolve. It is clear, however, that the record contains sufficient and competent evidence, direct and circumstantial, from which the trial court could find that the juvenile acted as a principal, a co-participant, or in concert with G____ B____ in the attack resulting in the death of her father, as alleged in the petition. Under the authorities above cited and the principles inherent in the Juvenile Code, the court below did not err in finding that she was in need of care and treatment and in sustaining the petition and ordering commitment. Point I is without merit.

The appellant–minor under Point II of her brief alleges that she was wrongfully denied the right of trial by jury. This Point is sought to be sustained in her brief upon two grounds:

*First,* the State's failure to proceed with the certification of her to the general law for trial as an adult; and *second,* the resulting invasion of her constitutional guarantees of a jury trial under the Constitution of Missouri and of the United States.

■ The first of these contentions is without merit for the reason that the request that she be certified to be tried as an adult was withdrawn, as was the Motion to Dismiss the Juvenile Court proceeding. This was done without objection from her counsel, and no further request for certification or waiver was made. Accordingly, there was nothing pending before the Juvenile Court on this facet of the proceedings, and whether or not the court would proceed upon the motion or waive jurisdiction rested entirely within its discretion. *State v. Williams,* 473 S.W.2d 382 (Mo.1971). Research has not disclosed and appellant has not cited any decision where a juvenile alleges error based upon a failure of the State to file and urge a request that the juvenile be tried as an adult under the general criminal law. Juvenile Court proceedings are generally accepted and recognized to be less harsh and more benign than the impersonal maelstrom of the criminal process.

■ The so–called misnomer of "certification" is in fact a waiver of the Juvenile Court of its initial exclusive jurisdiction and nothing more. While the court can direct that the juvenile authorities file such a request for waiver, it must be granted only upon a finding that the juvenile involved is beyond rehabilitative care, treatment and services of the court under the Juvenile Code. Once this waiver is made and the petition dismissed, the Juvenile Court loses all jurisdiction over the particular matter and is without power or authority to mandate what further action is to be taken, if any, either by the prosecuting authorities or the circuit criminal court. *State v. Ford,* 487 S.W.2d 1 (Mo.1972), cert. den. 411 U.S. 983, 93 S.Ct. 2277, 36 L.Ed.2d 959, *Richardson v. State,* 555 S.W.2d 83, 86–87[5] (Mo. App.1977). So in the face of the written position of the prosecutor in this case, that his office would and did decline to prosecute this juvenile under the criminal law, and the further fact that no showing was made that the juvenile was beyond all help provided by the juvenile process, the options open to the court below were to proceed with the trial on the petition or release the juvenile. Under all of these circumstances, the court properly retained jurisdiction and did not err in that regard.

■ As to the constitutional argument, it should be noted that before the adoption of the present Juvenile Code in Missouri the statutes of Missouri provided that in counties of the first and second class, and in the City of St. Louis, that the "child, his parent,

or any person standing in *loco parentis* to him may on his behalf demand a trial by jury. In all other cases trial shall be before the court without a jury, and the practice and procedure customary in proceedings in equity shall govern except where otherwise provided herein." Section 211.020 RSMo 1949.

With the adoption of the Juvenile Code, Laws 1957, p. 642, Sec. 1, et seq., the provisions were made applicable to all juvenile courts in Missouri alike and provided:

"Section 211.171. Hearing Procedure.

\* \* \* \* \* \*

6. The practice and procedure customary in proceedings in equity shall govern all proceedings in the juvenile court." Section 211.171 RSMo 1978.

The Code makes no reference to jury trials.

Under the law prior to 1957, the above–quoted provisions with reference to demands for jury trials applicable to counties of the first class applied also by separate statute to counties of less than 50,000 inhabitants. In the case of *State v. Heath*, 181 S.W.2d 517 (Mo.1944), a juvenile delinquency proceeding was instituted in Randolph County (one such county) and the juvenile demanded a trial by jury, which demand was denied by the court.

The act of the court was urged as error upon appeal. The Supreme Court affirmed upon the basis that the information filed in the Juvenile Division of the Circuit Court "did not charge the appellant with the violation of the criminal statutes of this state, but did charge him with being a delinquent child because he did violate the laws of this state". The court held that this being so, he was not entitled to trial by jury.

In the case of *In the Interest of Gary Everett Fisher, a Minor*, 468 S.W.2d 198 (Mo.1971), a delinquency proceeding was conducted in Jackson County, Missouri wherein it was alleged by information in the language of the criminal statute that the minor had committed a murder. The hearing before the Juvenile Court was conducted in accordance with the procedures specified in the Juvenile Code, and prior to the commencement of the hearing the minor's counsel filed a written request for a jury trial, but that request was denied.

Upon appeal from an order sustaining the information and committing the minor for care, treatment and services, the minor claimed that both his State and Federal constitutional rights had been violated by the denial of his request for jury trial.

In affirming the judgment, the Supreme Court, as to the Federal constitutional argument, said, l. c. 202:

" \* \* \* This question has been settled by the decision of the Supreme Court of the United States in *McKeiver v. Pennsylvania*, decided June 21, 1971, 403 U.S. [528], 91 S.Ct. 1976, 29 L.Ed.2d 647, wherein the court held that the Constitution of the United States does not require a jury trial in delinquency proceedings in the juvenile court."

The court further stated with reference to the Missouri constitutional argument:

"Defendant also urges that such jury trial is guaranteed by Article I, Section 18(a) of the Constitution of Missouri, 1945. This court in the case of *State v. Heath*, 352 Mo. 1147, 181 S.W.2d 517, held that the Missouri Constitution does not require a jury trial in delinquency cases in the juvenile court. We reaffirm that conclusion."

There is no merit to Point II.

The judgment below is accordingly affirmed.

All concur.