E. Arlene KUCHTA, Appellant,

v.

Eustis KUCHTA, Respondent.

No. 62439.

Supreme Court of Missouri,

En Banc.

Aug. 2, 1982.

Joan M. Krauskopf, Columbia, Charlotte P. Thayer, Grandview, for appellant.

Dennis G. Muller, Kansas City, for respondent.

Barbara J. Gilchrist, Barbara Wallace, Clayton, Rony Ellinger, Hannibal, M. Margaret O'Hare, Kansas City, Phyllis N. Segal, Legal Director, Judith I. Avemer, Anne E. Simon, National Center on Women and Family Law, New York City, for amicus curiae.

MORGAN, Judge.

On December 6, 1978, the trial court entered a decree of dissolution which terminated a marriage of some nineteen years between appellant and respondent. That portion of the decree pertaining to the division of marital property has been a subject of concern on appeal for much too long and particularly insofar as it relates to the "pension rights" of one spouse resulting from employment of the other. The record, however, reflects that the delay has not resulted from neglect but exhaustive efforts[1] to resolve a very complex problem, *i.e.*, the extent to which pension rights, and specifically those designated as "non-matured" and possibly subject to "forfeiture," shall be considered while dividing marital property as dictated in § 452.330, RSMo 1978 (as amended by Laws 1981);[2] which, in part, provides that: "In a proceeding for dissolution of the marriage . . . the court shall set apart to each spouse his property and shall divide the marital property in such proportions as the court deems just after considering all relevant factors including: (1) The contribution of each spouse to the acquisition of the marital property including the contribution of a spouse as homemaker; (2) The value of the property set apart to each spouse; (3) The economic circumstances of each spouse at the time the division of property is to become effective, including the desirability of awarding

---

1. After a Divisional Opinion was filed in the Western District of the Court of Appeals on September 18, 1980, modifying the trial court's decree, this Court approved the applications of both parties to transfer the cause to this Court. After arguments and submission, an opinion of this Court was filed on September 8, 1981. Thereafter, a motion for rehearing was sustained and the opinion as filed was withdrawn and further arguments were heard on January 13, 1982.

2. Unless otherwise indicated, statutory references are to RSMo 1978.

the family home or the right to live therein for reasonable periods to the spouse having custody of any children; and (4) The conduct of the parties during the marriage."

On reflection, it becomes apparent that whether or not present or prospective pension rights are to be classified as marital property is no longer of primary concern, but rather the manner by which the trial court can treat the same in seeking to reach a fair and equitable division thereof if necessary to comply with § 452.330.

In this further effort to resolve the issues presented, made under a recent reassignment, extended portions of previously prepared opinions will be utilized without benefit of quotation marks.

At the time of the decree there were three minor male children, ages 18, 17 and 16, whose custody was awarded to the respondent (father). Neither the award of custody nor the dissolution itself are now challenged.

The decree divided assets as follows:

| To Appellant: | Valuation |
| --- | --- |
| 1978 Monte Carlo, net of $2,200 lien | $2,800 |
| IBM typewriter | 450 |
| Household furnishings | 125 |
| Credit Union account | 2,856 |
| Debt to Park College | (625) |
| | $5,606 |

| To Respondent: | |
| --- | --- |
| Residence, net of $5,000 mortgage | $25,000 |
| Household furnishings | 375 |
| Shop equipment | 100 |
| 1965 Volkswagen | 50 |
| Savings accounts | 14,035 |
| Life insurance, cash value | 4,881 |
| TWA retirement plan | 11,505 |
| | $55,946 |

However, the court also awarded appellant $30,000, identified as "maintenance in gross," payable by a lump sum of $5,000 and monthly payments of $300 per month until satisfied. In the initial review, the court of appeals determined that factually appellant was not entitled to maintenance [3] and that the award of $30,000 in cash clearly was an effort to equalize the property distribution. In oral argument before this Court, both parties tend to agree with that characterization. Thus, in total, the respondent (husband) was awarded $55,946 and the appellant (wife) $35,606, with the former being charged with the expense of providing a home and rearing the three teen-aged sons, a factor for consideration under § 452.330.1(3). Being unable, with any degree of certainty, to rule that the financial obligation placed on respondent for the care of the three sons did not equal or possibly exceed the difference between the awards, we now consider the extent to which the TWA pension was for the trial court's consideration.

Pension benefits, in recent years, have assumed an increasingly important role in the economic security of employees. *See* Bonavich, Allocation of Private Pension Benefits as Property in Illinois Divorce Proceedings, 29 DePaul L. Review 1, 3–4 (1979) in which the author points out that in 1950, private retirement plans held about $12 billion in assets and covered about 10 million workers. In 1975, non-insured private retirement and pension plans held $145 billion in assets and retirement plans covered 30 million workers. The 1979 Statistical Abstract of the United States published by the Bureau of the Census lists, at 340, the assets of private pension funds in 1978 as $564.9 billion dollars. A spouse's retirement benefits may often be the most valuable asset belonging to a married couple. *See Bloomer v. Bloomer*, 84 Wis.2d 124, 267 N.W.2d 235, 238 (1978); Krauskopf, Marital Property at Marriage Dissolution, 43 Mo.L. Rev. 157, 171 (1978). In fiscal 1980, there were approximately 40,000 dissolution proceedings filed in the circuit courts of Missouri. Thus, making it certain that in many such proceedings the past, but now dissipat-

---

**3.** She, age 42, was qualified to support herself from employment. At time of trial, she was making $10,400 per annum as a patient advocate at a hospital, $1,500 as a part-time junior college teacher and $210 as a teacher of classes in religion or a total of $12,110. During the marriage she had earned a bachelor's degree and was only nine hours short of a master's degree. *In re Marriage of Vanet*, 544 S.W.2d 236 (Mo.App.1976).

ed, hopes of the spouses to enjoy together the future benefits of a pension plan constituted their greatest asset. As has been so often said, a pension is not earned on the last day of employment prior to retirement, but "is a form of deferred compensation which is attributable to the entire period in which it was accumulated." *Shill v. Shill*, 100 Idaho 433, 599 P.2d 1004 (1979). An untold number of cases [4] have made similar declarations, including the appellate courts of this state. *Daffin v. Daffin*, 567 S.W.2d 672 (Mo.App.1978); *Anspach v. Anspach*, 557 S.W.2d 3 (Mo.App.1977); *Jaeger v. Jaeger*, 547 S.W.2d 207, 212 (Mo.App.1977) and *In re Marriage of Powers*, 527 S.W.2d 949, 957 (Mo.App.1975). This Court's holding, partially to the contrary, in *Robbins v. Robbins*, 463 S.W.2d 876 (Mo.1971), should no longer be followed.

In passing, we do note 1978 amendments to the federal civil service retirement laws which expressly permit a division of retirement payments as marital property. In 5 U.S.C.A., Section 8345(j)(1) provides, in part, that: "Payments ... which would otherwise be made to an employee ... based upon his service shall be paid (in whole or in part) ... to another person if and to the extent expressly provided for in the terms of any court decree of divorce...." Further recognition of the status of retirement benefits may be found in recent federal legislation designed to encourage individual retirement accounts by offering specified tax advantages for creating the same.

In past efforts to resolve the issues presented, we have sought to identify those distinctive periods of "time" during the employment of a spouse when a dissolution could occur. Recital thereof tends not only to emphasize the problem but, in fact, may provide some general guidance for considering the same. In essence they are:

Stage I—If the employment were terminated, and the spouse had no right to receive anything, presently or in the future, except the amount he had contributed to the plan (plus interest), retirement benefits would be "non-vested" and "non-matured."

Stage II—If the employment were terminated, and the spouse was entitled to receive certain benefits beyond prior contributions, but only after reaching a designated retirement age, such retirement benefits would be "vested" but "non-matured."

Stage III—If the employment were terminated, and the spouse was entitled presently to certain benefits, beyond prior contributions, such retirement benefits would be "vested" and "matured."

Even a casual reading of the somewhat artificially designed "time-periods" makes it apparent that a trial court, if it deemed proper in the first instance, could act with a relative degree of certainty during Stage I or Stage III, with more lingering doubts in the latter.

■ However, speculative and perhaps insoluble questions often will be present in cases arising during Stage II that do not lend themselves to rigid and fixed rules. Because of the untold number of "pension plans" which appear to have their own singular and unique requirements for meeting "vesting" and "maturing" provisions, it is imperative that trial courts be authorized to apply a flexible approach to accommodate the particular facts of each case. Nevertheless, the threatened presence of contingencies which may create differing degrees of "risk of forfeiture" does not change the fact that many potential pension benefits have been and will be created by the *joint* efforts of both spouses and may be treated as "marital property." The uncertainties

---

4. Representative thereof are: *Van Loan v. Van Loan*, 116 Ariz. 272, 569 P.2d 214 (1977); *In re Marriage of Brown*, 15 Cal.3d 838, 126 Cal. Rptr. 633, 544 P.2d 561 (1976); *Linson v. Linson*, 618 P.2d 748 (Haw.App.1980); *Donley v. Donley*, 83 Ill.App.3d 367, 38 Ill.Dec. 733, 403 N.E.2d 1337 (1980); *Sims v. Sims*, 358 So.2d 919 (La.1978); *LeClert v. LeClert*, 80 N.M. 235, 453 P.2d 755 (1969); *Hansen v. Hansen*, 273 N.W.2d 749 (S.D.1979); *Cearley v. Cearley*, 544 S.W.2d 661 (Tex.1976); *In re Marriage of Jacobs*, 20 Wash.App. 272, 579 P.2d 1023 (1978); *Leighton v. Leighton*, 81 Wis.2d 620, 261 N.W.2d 457 (1978). *See generally* Annot., 94 A.L.R.3d 176 (1979).

thereof may dictate the style of the award to the non-working spouse, whose needs may be better served by receipt of less contingent assets. Above all else, it must be remembered that it is not mandatory that pension benefits be divided between spouses, whether they be fixed or otherwise, where other assets are available. In any dissolution proceeding, the most desired result would be a *full* and *final* division of marital property without contingencies. Where existing circumstances proscribe that objective, the trial court must be given a broad discretion to design "some plan" protecting the rights, and hopefully best interests, of the parties. With the limited experience of this and other courts in treating the subject, the quickest way to preempt the wise discretion of the trial courts would be to outline immediately fixed rules for division of such property and, at this time, we refrain from doing so. Nevertheless, we do recognize some efforts by others.

In the instant case, the court of appeals thought that requiring respondent to buy out appellant's future interests, if any, in the pension benefits would "place an unreasonable onus upon him" and that a "wait and see" approach would be better. All agree, that a delayed percentage division would be least disruptive, if resolved and fixed now, instead of making the amount of respective shares contingent on future events requiring further resort to the courts.

Another solution would be to establish a certain portion of the retirement benefits to be paid to the non-working spouse if and when the working spouse retires and begins to receive them. "This method of dividing ... interest in the pension renders it unnecessary for the court to compute the present value of the pension rights, and divides equally the risk that the pension will fail to [mature]." *Brown, supra,* 544 P.2d at 561. *See, e.g., Cearley v. Cearley,* 544 S.W.2d 661 (Tex.1976).

In more complicated cases, it has been suggested that the required calculations be made by the employer or administrator of the retirement plan:

These are the experts with the knowledge of the mathematical basis and working order of the plan who possess the statistical data and variables which may concern the particular employee. It should not be a valid objection to this proposal [the wait-and-see approach] that the evaluation of this interest is beyond mathematical precision. A reasonable approximation of the amount of the nonemployee spouse's interest should be held sufficient. Note, 24 Hastings L.J. 347, 357 (1972).

Returning to the facts of the instant case, we note again that the trial court set-off to the respondent a TWA retirement plan valued at $11,505. This figure was reflected in a letter from TWA to respondent advising that as of December 1, 1978, he could withdraw approximately $5,505 from a Plan A and $6,000 from a Plan B or $11,505. These amounts had accrued from contributions by both TWA and respondent as well as from interest earned thereon. Apparently the $6,000 value of Plan B is its real value and being identified as "IAM Trust Plan" provided only for a single sum payment upon termination of employment. However, the value attributed to Plan A ($5,505) was the amount which could have been withdrawn on December 1, 1978, if employment had been terminated. With passage of time as well as continued employment, benefits under the latter plan were designed to increase, and several possible projections have been presented. Nothing would be gained by recitals thereof as we need only recognize that the trial court properly considered "pension benefits" as marital property, and we find nothing in the record that consideration thereof was made in disregard of prospective and contingent "non-matured" possibilities presented to it. Review perhaps would have been simplified if the decree had been more explanatory as suggested in *Toomey v. Toomey,* 636 S.W.2d 257 (Mo. banc 1982).

Nevertheless, § 452.330, as heretofore quoted, provides that marital property may be divided "in such proportions as the court deems just after considering all relevant

factors including ...." Factors thereafter listed, in several instances,[5] are present in the instant case and were for consideration by the trial court in dividing assets; and, we cannot with any degree of certainty declare that the result reached was not equitable and just.

The decree and judgment of the trial court are affirmed.

DONNELLY, C. J., and SEILER, HIGGINS, and BARDGETT, JJ., concur.

RENDLEN and WELLIVER, JJ., concur in result.

---

**5.** We avoid substituting our judgment for that of the trial court, but necessarily notice that respondent has a sixth grade education (in Poland) in contrast to the master's degree commendably attained by appellant with time unavoidably taken from her duties as "homemaker" plus the speculative expense of respondent providing a home and college education for the three sons.