**Charles Edward CAMPBELL, Appellant,**

**v.**

**Ann Janet CAMPBELL, Respondent.**

**No. WD 34541.**

Missouri Court of Appeals,
Western District.

Feb. 7, 1984.

D. Éric Sowers, St. Charles, for appellant; Kennedy, Hamilton, Sowers & Schneider, St. Charles, of counsel.

George R. Lilleston, Clinton, for respondent.

Before PRITCHARD, P.J., and SHANGLER and MANFORD, JJ.

PRITCHARD, Presiding Judge.

In this dissolution case, trial began on December 21, 1982, the parties having separated on May 9, 1982. Their marriage took place in May, 1960, at Nicosia, Cyprus, where the husband was a sergeant in the U.S. Marine Corps and the wife was the acting secretary to the Charge d' Affairs of the U.S. Consulate.

In 1962, the couple returned to the United States, and lived in Independence, Missouri. The husband was first a dispatch clerk for a transportation company, and then obtained employment on a production line at the General Motors Fairfax, Kansas, plant, where he worked up to a supervisor position. He remained there until 1966, at which time their two daughters were ages one and seven. During a part of this time, the wife worked at Berry Tour and Travel in Kansas City, and for others as an executive secretary.

The husband then took employment with the CIA, and the family moved to Washington, D.C., for his training. He then left for Southeast Asia, and the wife and children followed him about six months later, but lived in a separate country from his duty station which was several hundred miles away. The husband was permitted to visit the family up to five days each month, and he extended his stay and service to 6½ or 7 years. His duties were rigorous. He was required to live in the jungle and in caves, and was under enemy siege at one time for 4½ months. During this time, because of the nature of his duties, the wife reared the children during their formative years, and was responsible for handling of the family finances.

In the summer of 1973, the family returned to the United States, and lived on the east coast until 1978, when they relocated to Clinton, Missouri, where they acquired an older home and proceeded to renovate it. The husband left the home in May, 1982, and at the time of the dissolution proceedings, he was still employed by the CIA, but was on sick leave, and he planned to retire in March, 1983, on reaching the age of 50 years.

Appellant's first point is that the trial court erred in apportioning his potential pension benefits as marital property. He first says that no evidence was presented as to whether or not the retirement plan was vested, but he himself testified that it was vested, and there was evidence that he

had, at the time of trial, contributed a total of $22,558.55 to the plan. If he could start receiving retirement pay on March 31, 1983, it would surely be *then* matured. He further contends that such evidence would have established that his potential pension benefits were separate property.

Exhibit 13, received by the husband, shows his benefits apparently as of October, 1982. In addition to his contributions, supra, it recites, "Mr. Campbell has indicated his intention to retire on his fiftieth birthday, in March 1983. Under the current formula, calculated on the basis of Mr. Campbell's service including sick leave as of 30 October 1982, should Mr. Campbell retire on 31 March 1983, he will receive a retirement annuity of $1,584 per month. This calculation is without a survivor annuity. Should Mr. Campbell elect to provide a standard survivor annuity, his retirement annuity (calculated on the basis stated above) would amount to $1,448 per month with a survivor annuity of $871 per month." The recital goes on to say that if Mr. Campbell reaches age 62, his annuity will be reduced: without survivor benefit, $1,314.00; with survivor benefit, $1,205 (the survivor benefit being $722, but these reductions could be avoided by his paying $681 during the year of his retirement).

That part of the decree dealing with retirement benefits awarded each of the parties 50% thereof, or $724 each (from the total, $1,448 per month at the husband's fiftieth birthday), and it further ordered him to elect an irrevocable survivor annuity in favor of the wife, and to direct his employer, in writing, to appoint one-half of his retirement benefits to be paid to her on his retirement, and to pay $681 or such sum as is ultimately necessary to avoid reduction of the retirement benefits at age 62. He was allowed to pay that full amount and deduct the wife's one-half from the maintenance payment.

The husband was ordered to pay the wife $750 per month, beginning January 1, 1983, as maintenance to the time of his retirement. Upon retirement, the maintenance was to be reduced to $125 per month (at which time, under the decree, the wife would have started receiving $724 from the retirement benefits).

■ The evidence shows that the husband's contributions to the retirement plan were made while the parties were married. Under *Kuchta v. Kuchta*, 636 S.W.2d 663, 666[2, 3] (Mo. banc 1982), his retirement benefits were properly considered to be marital property. He testified that they were vested, and his Exhibit 13 indicates that to be true—it shows what he would definitely receive on his retirement at age 50, with no contingencies other than a reduction of benefits upon the appointment of a surviving annuitant, and possibly a reduction of benefits at age 62 if he did not pay the $681 to prevent a reduction for social security benefits then receivable. The trial court did not have before it any uncertainties which could not be resolved with respect to the retirement benefits, and it did not err in dividing them as marital property. See these further cases where pension rights were divided as marital property: *Hurtgen v. Hurtgen*, 635 S.W.2d 69 (Mo.App.1982), where the present value of the husband's pension plan was divided equally, with a provision that he pay the wife's share in installments until paid in full; *Walker v. Walker*, 631 S.W.2d 68 (Mo.App.1982), where the court erroneously listed the husband's vested retirement account as his separate property, but even adding that amount to the marital property did not make its distribution unjust; and note also *Busch v. Busch*, 618 S.W.2d 244 (Mo.App.1981), holding that the trial court erred in not considering whether a wife's interest in a profit sharing plan and a retirement plan had vested, necessitating a dismissal and remand (appeal after remand, 639 S.W.2d 864 (Mo.App.1982)); *Coates v. Coates*, 650 S.W.2d 307 (Mo.App.1983), holding that the court did not err in treating the husband's non-disability military pension plan as marital property and awarding the wife a portion of the pension in view of subsequent enactment of the Uniformed Services Former Spouses protection Act, 10 U.S.C.A. § 1408, the pur-

pose of which enactment was to reverse the effect of *McCarty v. McCarty*, 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981). The *Kuchta* case, supra, 636 S.W.2d at 666, states a solution to the division of retirement benefits is to pay the other spouse a portion thereof when the other retires and begins receiving them, which is what was done here, and the trial court did not err in so decreeing.

■ Appellant's second point is that the trial court erred in ordering him to nominate the wife as the recipient of a potential survivor's annuity under his pension plan; and to contribute $681 to preclude a reduction of benefits at age 62, because it lacked jurisdiction so to order, in that the acts were elective for appellant to be performed at an undetermined future date. He cites no authority for these contentions. The husband was before the court which certainly did not lack authority to require affirmative acts of him to carry out its decree of division of the property, and to insure a protection to the wife against a cessation or reduction of her interests in the retirement benefits. The $681 payment in the year of retirement is for the husband's benefit as well as the wife's. It is noted that the decree provides that the husband may deduct one-half of that amount from the maintenance payments. The trial court did not abuse its discretion in requiring the $681 payment to be made by the husband. Besides, Barbara Pollack, of the Office of General Counsel, CIA, testified that the CIA would not raise any objection to orders directed to it as to the husband's retirement plan. Note also 50 U.S.C.A. § 403, Sec. 263(b), providing for payments by the Director in accordance with a court decree to a former spouse. Appellant's second point is overruled.

■ The third point is that the trial court erred in awarding the bulk of the marital property to the wife because it failed to consider the husband's relative contribution to the acquisition of the marital assets, in that (A) The court refused to receive the husband's testimony that a substantial part of his career was spent under extremely hazardous and primitive conditions while the wife resided in safety, comfort and luxury, and (B) The husband's unrefuted testimony was that the wife's conduct during the marriage was a hindrance rather than an asset to his career, which would have established that his contribution to the acquisition of the marital assets was much greater than hers. The husband attempts to draw a contrast between his hazardous duty in Southeast Asia, and the wife's relative comfort in another country for the 6½ years of his duty. During all of this time, the wife had the custody of the two young daughters, and she managed the finances of the family, using, of course, his salary. The novel contention that one party's hardship somehow results in a greater contribution to the marital assets is without merit for there must be thousands of couples where one is engaged in perilous employment, yet the accumulation of property during the marriage is presumed to be marital property under § 452.330.3. There is no evidence that the court did not weigh the factor of the husband's earnings during the marriage as against the wife's function as a homemaker and that of rearing the couple's children. The evidence is also that the wife did secretarial work prior to the time they moved to Southeast Asia, earning $600 to $700 per month, which was contributed to the family's living expenses.

■ Even if the husband's testimony, the offer of proof of which was rejected, be accepted that the wife's refusal to go (again) overseas with him hindered his career, that is not marital misconduct on her part which would affect a division of the property under the statute.

The husband does not complain of any specific award of property to the wife, other than the portion of his retirement benefits discussed above. He errs in stating that the trial court awarded the wife $49,865 in fixed assets and the husband $25,485 in fixed assets. What the record shows is that the wife was awarded $63,565, but was charged with the obligation of paying off $39,169.18 in marital debts, including the first and second mortgages on the mar-

ital home awarded to her. The husband was awarded $26,209 in property, and charged with the obligation to pay $6,040 in debts. Furthermore, the record shows he withdrew $4,900 cash values on life insurance policies, and he was unable to account for how it was spent. All these figures compute to $24,395.82 net value to the wife, and $25,049 to the husband, hardly an unequal division. The trial court did not err in dividing the property as contended in Point Three.

■ By Point IV, the husband challenges the trial court's finding that the wife was unable to support herself through appropriate employment because that finding was against the weight of the evidence in that she testified that she had substantial experience as an executive secretary and had made no effort to obtain employment and no contrary evidence was submitted, and she thereby failed to meet her burden of proof that she required maintenance. No challenge is made as to the amount of maintenance awarded. The evidence shows that the secretarial positions of the wife occurred in urban areas prior to about 1966 when she was still in the United States. She was then in Southeast Asia for 6½ or 7 years, where she was engaged only as a homemaker and in rearing the couple's two young daughters. After 1973, on returning to the United States, she successively had employment as a secretary on the east coast, and in St. Louis. In 1980, she was earning $600 to $700 per month. On moving to Clinton, Missouri, in 1982, she found employment for five or six days a week as a direct salesperson of dresses, which produced an income for about three months prior to trial of $445 per month. The previous secretarial employment took place in urban areas, and the trial court could properly infer that in the small city of Clinton, comparable employment was not readily obtainable. The trial court did, however, take into account the wife's present income, $445 per month, which is not greatly less than she earned in urban areas as a secretary previously. The factors laid out in § 452.335 have been substantially followed, including the previous wealthy lifestyle of the parties, as so characterized by the husband. See also the enumeration of factors to be considered in *Hull v. Hull,* 591 S.W.2d 376 (Mo.App. 1979).

■ Point VI should be considered in connection with the disposition of Point IV. By it, the husband contends that the award of marital property and maintenance was based upon the wife's unqualified and hearsay testimony as to her physical condition (medical diagnoses and prognoses). The wife testified that she had these physical problems, which any person would know of if they were so afflicted: Allergy and sinus problems; a back problem from falling down the stairs; some stomach problems; a thyroid condition, causing swelling, requiring medication. She was permitted to testify, however, over objection, that she had recurring phlebitis; a damaged, shrunken kidney; and a pinched nerve in her back, which could be said to be within the realm of expert medical testimony. Even ruling out the latter statements, the award should not be disturbed in view of the other considerations of the statute— i.e., the result would not be changed. All in all, from a consideration of the whole record, the discretion of the trial court [see *Sawtell v. Sawtell,* 569 S.W.2d 286 (Mo. App.1978) ] in making the award of maintenance and marital property does not appear to have been abused. Points IV and VI are overruled.

■ Point V contends that the trial court erred in awarding custody and support for the party's minor daughter upon the ground that neither the pleadings nor evidence complied with § 452.480. That chapter of the revised statutes is clearly designed to cover custody matters where the parties reside in different states, so that they may be brought before an appropriate court for adjudication. In this case, all the parties, including the child, reside in Missouri; hence, the dissolution of marriage statutes relating to child custody and child support govern. See § 452.375 as to factors to be used in determining custody

of a child in its best interests. Certainly that factor would demand that the 18 year old daughter remain in the family home with her mother in Clinton, Missouri, where she may continue her high school education with her peers. The child support is governed by § 452.340, one factor of which is the father's primary responsibility for support. The amount of support is not here challenged. Point V is overruled.

The judgment is affirmed.

All concur.