**Helen L. HAUN, Appellant,**

v.

**David Robert HAUN, Respondent.**

**No. 13133.**

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 24, 1984.

Stephen L. Shepard, Springfield, for appellant.

Dee Wampler, Wampler & Wampler, Springfield, for respondent.

CROW, Judge.

Helen Louise Haun ("Helen") appeals from a judgment dissolving her marriage to David Robert Haun ("David"). Her sole complaint is that the trial court, in dividing the marital property, erred in its treatment of David's "future retirement benefits." That error, insists Helen, rendered the apportionment of marital property unfair and inequitable.

Helen, born June 21, 1940, and David, born July 6, 1936, were married February 11, 1961. Their only offspring, Ruth Ann,

was born June 30, 1971.[1] The trial court granted Helen custody of Ruth Ann and ordered David to pay child support. Helen sought no maintenance, and she attacks nothing in the decree except the division of marital property.

David became employed by the Springfield, Missouri, Police Department on March 6, 1961, and he remained employed there, with no breaks in service, at time of trial (June 14, 1982). By then, he had risen to the rank of lieutenant, with commensurate responsibilities.

Helen, also gainfully employed throughout the marriage, was a senior reports clerk for Southwestern Bell Telephone Company at time of trial. She had worked for that company continuously for 15 years, and before that she had worked for Lily Tulip seven and a half years.

David's right to retirement benefits is established by ordinances of the City of Springfield. The secretary of the governing board of the pension system testified that as of May 15, 1982, contributions to the pension fund from David's salary totaled $17,341.35.

The secretary explained that a police officer with 20 years' service may retire at age 50 and begin drawing benefits. If the officer completes 20 years' service before reaching that age, his right to benefits is "vested," and remains intact even though he retires younger than 50. He cannot, however, draw any benefits until attaining 50.

The formula for computing the amount of the benefit is based on the officer's average monthly salary for the 36 months of highest earnings during his final 10 years of service. For convenience, we hereafter refer to that average monthly salary as the "base salary." The retired officer receives a monthly benefit calculat-

ed at 2 per cent of his base salary multiplied by his number of years of service. Computed in accordance with pension guidelines, David's base salary was $2,139.17 per month at time of trial.

At that time, the pension system was in the process of implementing a "cost of living" increase, which would augment benefits by an amount not exceeding 2.5 per cent thereof per year for retirees age 56 and over. No retiree had yet received an increase under that provision.

A university professor of economics, called as a witness by Helen, was asked to assume that David had retired from the police department on June 1, 1982, and that David would begin drawing retirement benefits when he reached age 50 (July 6, 1986). The professor was also asked to assume that David would live until April 6, 2015, his projected date of death based upon a mortality table judicially noticed by the trial court.

Proceeding on that hypothesis, and using (a) a base salary of $2,094.75,[2] (b) 21.2356 years of employment, and (c) a 2.5 per cent per annum increase in benefits beginning when David reached age 56 and continuing until his assumed date of death, the professor calculated that David would collect retirement benefits aggregating $394,028.04 during the 28.75 years he was expected to live after reaching age 50.

Next, the professor applied what he characterized as "an appropriate discount rate of 6.9 percent per annum." He explained this was "a 20-year historical average of virtually riskless treasury bills, notes, and bonds and Triple A corporate bond interest rates." Using this "discount rate," the professor calculated that the present value of the $394,028.04 that David was projected to receive during retirement was $121,178.33.[3]

---

1. Helen, at the time she married David, had a 3-year-old daughter whom David adopted during the marriage. This daughter was emancipated at the time the cause was tried.

2. As noted *supra,* the secretary of the governing board of the pension system computed David's base salary as $2,139.17. The professor, how-

ever, had previously been furnished a base salary for David of $2,094.75, and the professor based his computations on the latter figure.

3. As we understand "present value," in the context used by the professor, it means the amount of money David would have had to invest, at time of trial, at interest of 6.9 per cent per

Using the base salary computed for David by the secretary of the retirement board, $2,139.17, and employing the same method of calculation, the professor fixed the present value of David's retirement benefits at $123,747.96.

Helen, like David, possessed vested pension rights at time of trial. The meager evidence on that subject indicated that under her Bell Telephone Pension Benefit Plan, Helen would receive $258.54 per month upon attaining age 65 on June 21, 2005.

The professor, assuming Helen would live until September 10, 2023 (her hypothetical date of death based on the judicially noticed mortality table), calculated she would receive $56,527.19 during her 18.22 years of retirement. Reduced to present value by the same formula applied to David, the value of Helen's pension rights at time of trial was, according to the professor, $7,040.72.

The trial court, in dividing the marital property, awarded David, among other items, the "Springfield City Police & Fireman's Pension Fund, present value of $17,-000.00." The trial court awarded Helen, among other items, the "Southwestern Bell Pension, present value of $7,000.00."

It is readily observable that the value the court assigned to David's pension rights is approximately the sum of David's contributions at time of trial. The value the court assigned to Helen's pension rights is almost identical to the present value of her right to receive future benefits, as calculated by the professor. The trial court, therefore, used different bases for valuing each party's pension rights. In fairness, however, we note that no evidence was presented to the trial court regarding the amount of Helen's contributions to her pension. Consequently, it was impossible for the trial court to value Helen's pension rights on the same basis that the court valued David's.

Helen, citing *Kuchta v. Kuchta*, 636 S.W.2d 663 (Mo. banc 1982), asserts that inasmuch as David's pension rights, and hers, were marital property, the trial court was required to determine their respective values and distribute them in an equitable manner. She argues that the "actual contributions" method used by the trial court to value David's pension rights was inappropriate.

In considering this, we note that *Kuchta* teaches there are basically three "stages" in the acquisition of pension rights. 636 S.W.2d at 665. Stage I is the phase during which, if employment be terminated, the employee has no right to receive anything, then or in the future, except the amount of his contribution to the pension plan, possibly augmented by interest. Stage I benefits are characterized "non-vested" and "non-matured." Stage II is the phase during which, if employment be terminated, the employee is entitled to receive certain benefits exceeding his contributions, but only after reaching a designated retirement age. Stage II benefits are characterized "vested" but "non-matured." Stage III is the phase during which, if employment be terminated, the employee is entitled to receive, instanter, certain benefits exceeding his contributions. Stage III benefits are characterized "vested" and "matured."

■ It is evident that, at time of trial, both David's and Helen's pension rights were in Stage II, vested but non-matured. It is equally clear that the pension rights of both were marital property, having been acquired, in toto, during the marriage. *Kuchta; Lynch v. Lynch*, 665 S.W.2d 20, 23[1] (Mo.App.1983); *Cregan v. Clark*, 658 S.W.2d 924, 928[11] (Mo.App.1983).

*Kuchta* points out that generally, Stage II retirement benefits are the most difficult type for trial courts to deal with in dissolution cases. 636 S.W.2d at 665. Various methods have been utilized.

In *Kuchta*, the husband was awarded the entire interest in his pension rights, but

annum, compounded annually, in order to receive the aggregate retirement benefits projected

for him by the professor.

ordered to pay the wife an offsetting cash award in scheduled installments. 636 S.W.2d at 664. The same scheme was used in *Fort v. Fort,* 670 S.W.2d 173 (Mo.App. 1984).

Evidence similar to that in the instant case was presented in *Johnson v. Johnson,* 671 S.W.2d 426 (Mo.App.1984). There, the present cash value of the husband's vested right to receive future retirement benefits was calculated, and one-third of that amount was awarded to the wife, to be paid by the husband in monthly installments. The husband argued that this disposition placed a "risk of forfeiture" on him, in that his pension benefits would cease upon his death but the award to the wife would nonetheless have to be paid, presumably by his estate. His argument was rejected.

*Ledbetter v. Ledbetter,* 547 S.W.2d 214 (Mo.App.1977), involved a wife's profit sharing plan, payable upon future retirement. The decree provided that the proceeds were to be divided equally when received. The husband's contention that to avoid delay, all rights in the plan should have been awarded to the wife and he should have been awarded equivalent assets from other marital property, was rejected. Such disposition would have awarded the husband substantially all of the parties' liquid assets.

In *Campbell v. Campbell,* 668 S.W.2d 580 (Mo.App.1984), the husband, with vested pension rights, intended to retire within a year after trial. The court awarded each party half the pension benefits.

A "wait-and-see" approach was utilized in *Lynch, supra,* 665 S.W.2d 20, where the husband was employed by an insurance company at time of dissolution. He had acquired certain vested, but non-matured, pension rights through that employment. The wife was awarded a share of each monthly pension payment, when and if received. Her share was fixed at one-half of a fraction of the payment, the numerator of which was the. number of years the husband was employed by the insurance company during the marriage, and the de-

nominator of which was the total number of years the husband was employed by that company. *Lynch* recognized the virtue of the "immediate offset method" in *Kuchta,* which provides a full and final division of marital property without contingencies. *Lynch* noted, however, that the *Kuchta* method is not realistic in every case, and that the "wait-and-see" approach equally divides the risk that the pension will fail to mature.

Helen, in her scholarly and comprehensive brief, insists the trial court should have used either the "present cash value" method (as in *Johnson,* 671 S.W.2d 426) or the "wait-and-see" method (as in *Lynch,* 665 S.W.2d 20) in valuing and apportioning David's pension rights. She says the trial court erred in valuing those rights at the amount of David's contributions.

In determining whether Helen's complaint has merit, we must take note of other aspects of this case not yet mentioned.

Contrary to the professor's assumption, David testified he had no plans to retire at age 50, and that he could continue his employment until age 60. If he does, that would dramatically reduce the "present value" of his pension rights. First, the aggregate amount of the benefits would be reduced, in that there would be 10 fewer years during which benefits would be paid. Second, the date at which benefits would begin would be postponed for 10 years. It obviously requires a smaller deposit of money at age 46,[4] compounded annually, to produce a specific amount at age 60 than it does to produce the same amount at age 50, in that (a) the fund has 10 additional years to earn interest between ages 50 and 60, and (b) the additional interest earned during those years compounds each year.

It is also noteworthy that David pays no Social Security taxes from his earnings as a police officer. Consequently, we infer that this occupation is not "employment," 42 U.S.C.A. § 410(a)(7) (1983), for the purpose of entitlement to old-age insurance

---

**4.** David lacked 22 days being 46 years of age at time of trial.

benefits, 42 U.S.C.A. § 402(a) (1983), under the Social Security program.[5]

Helen testified "social security tax" was deducted from her earnings, so we assume her occupation is "employment" for Social Security purposes. Having been engaged in that occupation for 15 years, it is likely that at time of trial she had earned enough quarters of coverage to be a "fully insured individual," 42 U.S.C.A. § 414(a) (1983), and therefore will be entitled to old-age insurance benefits upon reaching retirement age. 42 U.S.C.A. § 402(a)(2) (1983).

We are also mindful that, excluding the parties' pension rights, Helen was awarded the greater share of the marital property.

The one tract of real estate (the marital home) was assigned a fair market value of $46,000 by the trial court. Neither party disputes that figure on appeal. Subtracting the balance due on a first mortgage lien, $9,672.47, leaves a net real estate value of $36,327.53. The judgment ordered the real estate sold, with the net proceeds, after satisfying the lien, divided 23/36 to Helen and 13/36 to David. In lieu of sale, the judgment granted David the option (to be exercised within a stated deadline) of paying Helen $23,000 and receiving all right, title and interest in the real estate. It therefore appears that Helen, under either eventuality, will receive an estimated $10,000 more from the real estate than David.

The remaining items of marital property—all personalty—consisted of deposits, motor vehicles, cash, securities and miscellaneous chattels. All were painstakingly valued by the trial court. None of the assigned values is challenged on appeal. As best we can calculate, the aggregate value of the personalty awarded Helen is

between $16,924.32 and $17,324.32.[6] The aggregate value of the personalty awarded David is between $15,078.82 and $16,328.82.[7]

Helen does not contend that she should have been awarded marital property of greater value than that awarded David. Indeed, she stipulated with him at trial that "a fifty-fifty split would be a fair and reasonable settlement." Her position is simply that David's pension rights are worth far more than the $17,000 value assigned by the trial court, and that when those rights are valued at the proper amount, the total value of the marital property awarded David vastly exceeds the total value of the marital property awarded her. She maintains that if David is allowed to retain all right, title and interest in his pension rights, the only equitable way to dispose of the rest of the marital property is to award all of it to her. Alternatively, she suggests that she be awarded "a proportionate share of David's benefits payable beginning at age 50." She neglects, however, to explain how this should be done if David continues to work until age 60 and thereby draws no retirement benefits until then.

The trial court, of course, was not obliged to assume that David would begin drawing retirement benefits at age 50, particularly in view of David's testimony that he had no plans to retire at that age and that he could remain in his employment until age 60. There was no evidence of the present value of David's pension rights based on retirement at age 60. As already noted, however, that value would be far less than if he were to begin drawing benefits at age 50.

Additionally, we cannot overlook the fact that Helen acquired two different retirement benefits during the marriage, her

5. David, for some 10 years, had outside employment as a private security officer at a shopping mall. During the final 2 years of that employment (1980–81), he earned about $2,000 annually. Before that, it was less than $500 per year. We assume that occupation was "employment" for Social Security purposes, and that David thereby accumulated some "quarters of coverage," 42 U.S.C.A. § 413(a)(2)(A) (1983), toward becoming insured. 42 U.S.C.A. § 414 (1983).

6. In valuing several items, the trial court set a "range" between a low and a high figure. This accounts for the low and high aggregate values of the personalty awarded Helen.

7. The trial court also set a "range" in valuing several of the items awarded David.

Southwestern Bell pension and her old-age insurance coverage under Social Security. Although there was no evidence on the value of the latter, its worth is indisputably significant. Awarding Helen a share of David's pension would result in her collecting all of her Southwestern Bell pension, all of her old-age insurance under Social Security, and part of David's pension, leaving David with the remainder of his pension and whatever old-age insurance benefits he has earned under Social Security, if any. The alternative, an award to Helen of marital assets "offsetting" David's pension rights, would be highly speculative in the face of David's testimony that he can remain employed until age 60, and the absence of evidence of the present value of his pension rights if he waits until then to retire.

The record establishes that the marital property, excluding both parties' pension rights, had an aggregate net value between $68,330.67 and $69,980.67. Assuming Helen receives $23,000 from the real estate, either as a result of sale or from buy-out by David, and valuing the personalty awarded to her at the low end of the range fixed by the trial court ($16,924.32), and the personalty awarded to David at the high end of the range fixed by the court ($16,-328.82), Helen, according to our arithmetic, receives marital assets worth $39,924.32, being 57.4 per cent of the total value (excluding pension rights), and David receives the remaining 42.6 per cent. Valuing the personalty awarded to Helen at the high end of the range ($17,324.32), all other figures remaining constant, Helen receives 57.6 per cent of the aggregate value of the marital property, excluding pension rights.

■ In deciding whether a trial court's division of marital property should be disturbed, we are guided by the rule that under § 452.330, RSMo 1978, as amended by Laws 1981, p. 615–16, the trial court is required only to divide the marital property in a just fashion. *Lewis v. Lewis*, 637 S.W.2d 207, 209[5] (Mo.App.1982). This does not require an equal division of the property, but a fair and equitable one. *Id.;*

*Metts v. Metts*, 625 S.W.2d 896, 899[6] (Mo. App.1981). The trial court is vested with considerable discretion in dividing marital property, and an appellate court will interfere only if the division is so heavily and unduly weighted in favor of one party as to amount to an abuse of judicial discretion. *Lewis*, 637 S.W.2d at 209–10; *Metts*, 625 S.W.2d at 899[6].

■ Had David's pension rights been the only ones acquired by either party during the marriage, Helen's argument would be persuasive. In such circumstances, it would have been appropriate to award Helen a fractional interest in David's retirement benefits, when and if received, or to award her sufficient marital property to offset David's pension rights (assuming there were sufficient marital property for that purpose). The latter method would have been difficult, in view of the absence of evidence of the present value of David's pension rights based on retirement at age 60.

We need not, however, speculate as to how the trial court might have proceeded in such a situation, as that is not the posture of this case. When we consider the retirement benefits Helen has acquired during the marriage, and the fact that the other marital property awarded her made up some 57 per cent of the marital estate, excluding pension rights, we cannot say that the trial court's division of the marital property so heavily favored David as to amount to an abuse of judicial discretion. Consequently, the trial court must be upheld. *Colabianchi v. Colabianchi*, 646 S.W.2d 61, 64[3] (Mo. banc 1983).

Judgment affirmed.

GREENE, C.J., FLANIGAN, P.J., and TITUS, J., concur.