**In re the MARRIAGE OF Jackie Jean JOHNSON and Gerald Wayne Johnson.**

**Jackie Jean JOHNSON, Appellant,**

v.

**Gerald Wayne JOHNSON, Respondent.**

**No. 17217.**

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 29, 1991.

---

James E. Spain, Keith D. Sorrell, Spain, Merrell and Miller, Poplar Bluff, for appellant.

Donald Rhodes, Michael Moroni, Bloomfield, for respondent.

CROW, Judge.

Jackie Jean Johnson appeals from a decree dissolving her marriage to Gerald Wayne Johnson. Jackie's [1] sole point relied on avers the trial court abused its discretion by dividing the marital property in a manner that "disproportionately favored [Gerald]."

■ We review per Rule 73.01(c), Missouri Rules of Civil Procedure (1991), as construed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The decree of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. 536 S.W.2d at 32 [1]. This standard applies to appeals from decrees of dissolution of marriage. *In re Marriage of Campbell*, 685 S.W.2d 280, 283 [3] (Mo. App.1985); *Whitenton v. Whitenton*, 659 S.W.2d 542, 546 [1] (Mo.App.1983). Where, as here, neither party requested the trial court to make findings of fact or conclu-

sions of law, and the trial court made none, all fact issues are considered as having been resolved in accordance with the result reached. Rule 73.01(a)(2); *Fornachon v. Fornachon*, 748 S.W.2d 705, 707 [1] (Mo. App.1988); *In re Marriage of Clark*, 718 S.W.2d 649, 653 [2] (Mo.App.1986).

Viewed according to the above criteria, the evidence establishes Jackie married Gerald November 26, 1988. It was Gerald's second marriage. He had three children by his first wife, who was deceased at the time the instant case was tried.[2] Gerald's two youngest children, Chad and Marty, were 18 and 11, respectively, when Gerald married Jackie. Chad and Marty lived with Gerald and Jackie after the marriage.

Jackie had a son, Christopher, at the time she married Gerald. Christopher did not reside with Jackie and Gerald after the marriage, but did visit them "two weeks at Christmas."

Jackie, age 41 at time of trial, was a public school teacher when she married Gerald. Gerald, age 51 at time of trial, was employed by an airline as a "copilot" when he married Jackie.

After the marriage, the parties resided in Dexter in a house Gerald owned at the time they wed. Because of Gerald's occupation, he was usually gone four days, then home three.

Some three months after the marriage, Gerald informed Jackie he wanted "to put in a bid to be captain." He applied, was accepted, and attended "pilot school" in Denver several weeks. During that period, Jackie, who was teaching school weekdays, continued to cook and keep house for Brad and Marty.

Gerald successfully completed training and was elevated to captain. Inasmuch as he had no regularly scheduled flight, he was required to go to Chicago and "be on call." As a result, he was sometimes gone from home six consecutive days.

At the time of the marriage, Jackie owned a 1982 automobile, furniture and

---

**1.** For convenience, we henceforth refer to the parties by their respective first names.

**2.** Trial occurred September 26, 1990.

household goods, and an interest in "a teacher retirement program." The value of that interest at the time of the marriage is not shown. However, Jackie testified about $2,700 was paid into the retirement plan during the marriage.

Jackie also testified she had a "CAFE plan." She explained it is "vision insurance," and if she became sick and lost work, "it would pay my salary." The record is silent as to the value (if any) of this asset.

During the marriage, the parties traded in Jackie's 1982 automobile on a 1988 Topaz. At the time of that transaction, Jackie owed her school credit union $7,455. She and Gerald borrowed an additional $8,500 from the credit union to pay the cash difference for the Topaz.

Gerald's assets at the time of the marriage included two houses. On one, referred to in the transcript as "the rent house," Gerald owed $43,000 when he married Jackie. The rent he was receiving from the tenants was insufficient to service the debt. According to Jackie, she and Gerald borrowed $1,200 from her school credit union during the marriage to pay interest Gerald owed on the rent house loan.

Gerald sold the rent house during the marriage. He testified only $200 remained after satisfying the indebtedness on it. That testimony was uncontradicted.

The other house Gerald owned at the time of the marriage was the one he and Jackie occupied before separating. At the time of the marriage, there was a lien on it securing a debt in the principal amount of $80,077.55.

Gerald owned four automobiles at the time of the marriage. At time of trial, his eldest child (a college student) was driving one. Chad, also attending college at time of trial, was driving another. A third (a 1975 Oldsmobile) was in Chicago to provide Gerald transportation when he was there. The fourth vehicle was his everyday transportation.

Gerald also had two "retirement plans" at the time of the marriage. One, desig-

nated the "Fixed Benefit Plan," is funded entirely by his employer. There was no evidence about the value of that asset on the date of the marriage. However, Gerald testified the Fixed Benefit Plan would pay him $1,540 per month at age 60, according to current calculations.

Gerald's other retirement plan on the date of the marriage was characterized the "Direct Account Plan." A percentage of his salary goes into it. Its value fluctuates according to the performance of the investments. On November 23, 1988, three days before the marriage, the value was $106,501.83. Gerald testified he could withdraw assets from this plan only on retirement or termination of employment.

Jackie testified Gerald owed about $43,000 to his credit union at the time of the marriage. Asked whether that debt was reduced during the marriage, she replied, "He told me he paid $25,000 off." This testimony was uncontradicted.

The parties separated April 15, 1990. At that time, the principal balance of the loan on the house they had been occupying—owned by Gerald before the marriage—had been reduced to $78,931.36.

As of August 28, 1990, the value of Gerald's Direct Account Plan was $138,169.38. At trial 29 days later, Gerald testified its value had dropped by $10,000 "in the last month" due to the stock market. This testimony was uncontradicted.

On the trial date, the parties were indebted to Jackie's school credit union on two loans. While the record is not as precise as it should be, we gather the aggregate amount of this indebtedness was approximately $12,200.

There were uncashed federal and state tax refund checks payable to the parties. The federal refund was $4,562; the state refund was $691.

The decree awarded Jackie the personal property she owned before the marriage, the 1988 Topaz automobile, her pension, half the federal and state tax refunds, and a few items of personal property acquired during the marriage. Jackie testified the latter items were gifts to her from Gerald

and others. This testimony was uncontradicted except as to a used television set, the value of which is not shown.[3]

The decree awarded Gerald his four automobiles, his Fixed Benefit Plan, his Direct Account Plan, half the federal and state tax refunds, and sundry items of personal property. The decree also awarded Gerald an asset identified as "[h]is USMC retirement." We find no testimony about it in the transcript and no discussion of it in the parties' briefs.

The decree ordered Jackie to pay the indebtedness to her school credit union. Gerald was directed to pay Jackie $1,200, evidently representing the sum which, according to her, she and he borrowed to pay interest he owed on the rent house loan, mentioned earlier.

The decree ordered Gerald to pay the loan on his remaining house. The decree also listed 15 other creditors and ordered Gerald to pay them. The amounts of those debts are not stated in the decree.

Jackie launches her attack on the decree by stating she started the marriage with a 1982 automobile and a credit union debt of $7,455, and ended the marriage with the 1988 Topaz and a credit union debt of $16,212. Consequently, says Jackie, she "did not get any real value of marital property in the award."

Jackie's allegations are inaccurate in two respects. First, according to Jackie's answer to one of Gerald's interrogatories, the Topaz was purchased May 12, 1989, some five and a half months after the marriage. As we understand the testimony, the debt to Jackie's school credit union was $7,455 at the time of this transaction, not on the date of the marriage. The debt on the marriage date is not shown.

Second, we noted earlier that the evidence regarding the indebtedness to Jackie's school credit union at time of trial was imprecise. The trial court attempted to clarify it by questioning Jackie. Her responses, as we comprehend them, reveal the aggregate amount of the indebtedness

was about $12,200, not $16,212 as asserted in her argument. Gerald's testimony, as we grasp it, confirms $12,200 was the approximate amount of the debt at time of trial.

Jackie concedes the $2,700 paid into her retirement plan during the marriage constituted marital property. She acknowledges there was no testimony about the value of the Topaz at time of trial.

The factors noted in the three preceding paragraphs indicate Jackie's situation is not as bleak as she believes. The debt to her school credit union (assigned her by the decree) is $4,000 less than she asserts, and Gerald is to pay her $1,200 toward it. Jackie entered the marriage with a six-year-old automobile; she departs with a 1988 automobile purchased 16 months before trial. She receives the $2,700 increase in her retirement plan and $2,626.50 representing half the tax refunds.

Jackie asserts Gerald's financial position improved during the marriage in that: (1) he reduced his debt to his credit union by $25,000, (2) he reduced the debt on his remaining house by $1,146.19, and (3) his Direct Account Plan increased by $31,667.55. There is uncontradicted evidence supporting propositions "(1)" and "(2)." While there is also evidentiary support for proposition "(3)," there is evidence that the Direct Account Plan increase was only $21,667.55 at time of trial. That evidence is Gerald's testimony that the value of this asset dropped by $10,000 in the month preceding trial because of reverses in the stock market.

■ In determining the sufficiency of the evidence to support the decree in this judge-tried case, we accept as true the evidence and inferences from it favorable to the decree and disregard contrary evidence. *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654 [2] (Mo. banc 1989). Inasmuch as Gerald's testimony about the drop in value of his Direct Account Plan shortly before trial is favorable to the decree, we treat this asset

3. Gerald's brief refers to a "redwood glider" which, according to his testimony, was purchased during the marriage. We do not find that item in the decree.

as having increased by only $21,667.55 during the marriage.

Responding to Jackie's contentions, Gerald proclaims the decree assigned him "marital debts" totaling $20,020. In support of this, Gerald refers us to his Exhibit D. The exhibit itemizes debts to sundry creditors, including seven in the list assigned Gerald by the decree. Viewed favorably to the decree, Exhibit D supports a finding that debts totaling $20,020 to those seven creditors were incurred during the marriage and remained unpaid at time of trial.

Gerald also asserts the decree awarded Jackie her "CAFE plan." However, we find no mention of this asset in the decree and, as noted earlier, there was no evidence of its value either at the time of the marriage or on the date of trial.

Jackie reminds us pension benefits accruing during marriage are considered marital property. *Kuchta v. Kuchta*, 636 S.W.2d 663, 666 [3] (Mo. banc 1982). She asserts the "real issue" in this appeal concerns the increase in value of Gerald's Direct Account Plan during the marriage. Jackie maintains the increase was $31,667.55; however, as explained above, we must lower that figure by $10,000.

■ Division of marital property per § 452.330, RSMo Supp.1988, is committed to the sound discretion of the trial court, and its decision should be upheld unless abuse of discretion is shown. *Colabianchi v. Colabianchi*, 646 S.W.2d 61, 64 [3] (Mo. banc 1983). Equal division is not required. *Dardick v. Dardick*, 670 S.W.2d 865, 869 [4] (Mo. banc 1984). An appellate court will interfere with a trial court's division of marital property only if the division is so heavily and unduly weighted in favor of one party as to constitute an abuse of discretion. *Id.* at 869 [5].

■ Viewed favorably to the decree, the evidence shows Jackie owed her school credit union $7,455 when the 1988 Topaz was purchased five and a half months after the marriage. She owed $12,200 to the same creditor at time of trial, an increase in debt of $4,745. However, she had a

newer automobile (the Topaz). While its value at time of trial is not shown, Jackie's answer to one of Gerald's interrogatories states $9,450 was paid for it 16 months before trial. The Topaz was obviously worth more than the six-year-old automobile Jackie owned when she married Gerald. Furthermore, the decree commands Gerald to pay Jackie $1,200 against the debt to her school credit union. This effectively reduces that debt to $11,000. It thus appears Jackie's automobile/debt situation was as good, or better, at time of trial than at the time of the marriage. Additionally, the funds in Jackie's retirement plan increased by $2,700 during the marriage. The decree awarded her this, along with $2,626.50 representing half the tax refunds.

Given these circumstances, we reject Jackie's contention that she was awarded no marital property of real value.

We recognize there is evidence Gerald reduced his debt to his credit union by $25,000 during the marriage, and simultaneously reduced the debt on his remaining house by $1,146.19. Additionally, Gerald does not challenge the proposition that the value of the assets in his Direct Account Plan increased by $21,667.55 between the marriage and the trial.

Jackie insists we should grant her a lump sum award to "equalize" the disposition of marital assets. We may do so only if the trial court's disposition of the marital property amounted to an abuse of discretion, for only then are we permitted to disturb the decree.

We find no abuse. While Gerald reduced his unsecured indebtedness by $25,000 and the debt on his remaining house by $1,146.19 during the marriage, the decree assigned him marital debts aggregating $20,020. Jackie testified her annual earnings are $21,500. According to her, Gerald was earning around $95,000 per year at the time of the marriage. His annual earnings rose to around $120,000 when he became a captain. Gerald thus supplied over 80 percent of the parties' income during the time his personal indebtedness was reduced. Jackie does not contend Gerald used any of

her earnings for such purpose. Indeed, her brief refers to "Gerald's use of his wages" to reduce his "premarital debts." Furthermore, Jackie makes no contention Gerald failed to bear his proper share of the family's living expenses.

Jackie cites *Washington v. Washington,* 763 S.W.2d 714 (Mo.App.1989), in support of her argument for a lump sum award. That case is inapposite, as it involved parties who lived together in marriage 19 years and raised four children. Here, the parties separated 17 months after the marriage.

Additionally, Jackie's employment at time of trial was the same as when the parties wed. The relatively brief marriage did not enfeeble her economic self-sufficiency.

More importantly, Jackie supplied the trial court scant information about Gerald's pension rights. The record is silent regarding how long Gerald has worked for the airline, whether his Fixed Benefit Plan is vested, and when he will begin receiving benefits. Although Gerald testified the Fixed Benefit Plan would pay him $1,540 per month at age 60 (based on current calculations), there was no evidence as to whether retirement at that age is mandatory or what would occur should he die younger. The record likewise supplies no hint as to what benefits he will draw under the Direct Account Plan or what would happen should he die before retiring.

A trial court abuses its discretion when the court's ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable persons can differ about the propriety of the trial court's action, it cannot be said the court abused its discretion. *State ex rel. Webster v. Lehndorff Geneva, Inc.,* 744 S.W.2d 801, 804 [1] (Mo. banc 1988).

Applying this standard to the record here, we cannot convict the trial court of error. Considering the abbreviated marriage, the award to Jackie of her pension rights, and the paucity of information about Gerald's pension rights, we are un-persuaded the trial court abused its discretion in failing to grant Jackie a lump sum award to offset the difference between the increase in assets in her retirement plan and Gerald's during the marriage. We have no way to determine what amount (if any) would have been justified. While Jackie says she should receive $16,400, she supplies no clue as to how she computes that sum.

Viewed favorably to the decree, the increase in value of Gerald's Direct Account Plan during the marriage was about $19,-000 more than the contributions to Jackie's retirement plan during the same period. A $16,400 award to Jackie would give her 86 percent of that excess. Nothing in the record supports that.

Furthermore, § 452.330.2, RSMo Supp. 1988, provides:

"For purposes of sections 452.300 to 452.415 only, **'marital property'** means all property acquired by either spouse subsequent to the marriage except:

. . . .

(5) The increase in value of property acquired prior to the marriage ... unless marital assets ... have contributed to such increases and then only to the extent of such contributions."

The record fails to reveal how much of the gain in value of Gerald's Direct Account Plan during the marriage was attributable to (a) increase in worth of assets acquired prior to the marriage, or (b) contribution of marital assets. Lacking this information, the trial court could not have determined how much of the increase was marital property. Neither can we.

The burden of demonstrating error is on Jackie. *State ex inf. Ashcroft, ex rel. Plaza Properties, Inc. v. City of Kansas City,* 687 S.W.2d 875, 876 [2] (Mo. banc 1985). She has failed to do so.

The decree of dissolution of marriage is affirmed.

PREWITT, P.J., and PARRISH, J., concur.