**In the Interest of Gary Everett FISHER, a Minor.**

**No. 54670.**

Supreme Court of Missouri, Division No. 2.

June 28, 1971.

and one-half day hearing, sustained the petition filed by the Juvenile Officer and found that Gary Everett Fisher was in need of the care, treatment and services of the Juvenile Court. The court's order committed Gary to the Missouri Division of Mental Diseases for placement at State Hospital No. 1 at Fulton for care and treatment until further order of the court. We affirm.

In the petition filed by the Juvenile Officer, Gary was charged (in the language of § 559.010) with killing by means of a knife Mrs. Kay Ransier who resided on the second floor of the house in which Gary lived with his parents. This case was tried pursuant to the procedure specified in § 211.171, the trial being by the court without a jury and with the public excluded from the hearing. Prior to commencement of the trial, counsel for Gary filed a written request for a jury trial, relying on state and federal constitutional provisions, but that request was overruled.

The two issues urged on this appeal are (1) that the evidence does not support the finding and judgment of the Juvenile Court because Gary was not shown beyond a reasonable doubt to have killed Kay Ransier, and (2) that denial of the request for a jury deprived Gary of his constitutionally guaranteed right of trial by jury.

Robert G. Duncan, Pierce, Duncan & Hill, Kansas City, for father, Garland Fisher, and for appellant child, Gary Everett Fisher.

John C. Danforth, Atty. Gen., Gene E. Voigts, First Asst. Atty. Gen., Jefferson City, for respondent.

FINCH, Judge.

This is an appeal from the judgment in a proceeding under Chapter 211,[1] (The Missouri Juvenile Code) wherein the Juvenile Judge of Jackson County, after a five

■ At the outset, we note that even though this case was tried prior to the decision of In the Matter of Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, the attorneys recognized that proof beyond a reasonable doubt of the guilt of Gary Fisher was required. Applying that test, the judge of the Juvenile Court found that the evidence that Gary killed Mrs. Ransier was overwhelming. In reviewing the sufficiency of the evidence to support that finding and judgment, we treat it as equivalent to a jury verdict and we consider the evidence and the inferences to be drawn therefrom in the light most favorable

1. All statutory references are to RSMo 1969 and V.A.M.S., unless otherwise indicated.

thereto. State v. Clark, Mo., 438 S.W.2d 277.

Gary lived with his parents at 3534 Windsor, in Kansas City. The Fishers, who owned the house, lived on the first floor and rented the second floor to Mrs. Ransier and her two small children (two and three years old). On September 2, 1968 (Labor Day), Mr. and Mrs. Fisher left their house at 4:15 p. m. and picked up Gary, who was at a friend's house playing football. They went to visit relatives and returned home at about 10:00 p. m. Meanwhile, at about 4:30 p. m., Mrs. Ransier and her two children accompanied a sister to their parents for a cookout. The sister brought them back to the apartment at about 7:30 p. m.

The Fishers had seen Mrs. Ransier when they left at 4:15 but did not see her after they returned at 10:00 p. m. However, Mrs. Fisher did hear footsteps upstairs after she went to bed that evening.

When the Fishers returned home, Gary went to the basement to take a bath and then remained up to watch the late TV movie in a TV room on the first floor adjacent to his bedroom. That movie began about 10:30 p. m. Mr. and Mrs. Fisher went to bed at about that time. At 1:30 a. m. Mrs. Fisher awakened and heard Gary going to the basement. She called to him to ask him what he was doing, and he replied that he had forgotten to drain the water from the tub and had gone downstairs to do so. When she heard water running from the tub, Mrs. Fisher returned to bed.

Mr. Fisher arose at the usual time of 5:15 on the morning of September 3. When he opened the door between their bedroom and the hall to go out and get the morning paper, he heard an alarm clock ringing. At about 5:30 he called his wife and she, too, noticed the alarm. She started breakfast, but the alarm kept ringing, so they both went upstairs to call Mrs. Ransier or to ascertain what was wrong. Mrs. Ransier usually arose early because she worked as a waitress. When she went to work, she left her children in the care of Mrs. Fisher.

When Mr. and Mrs. Fisher went upstairs they noticed that the upstairs hall light, usually left on at night, was not burning. They turned on the hall light and then stepped into the room used by Mrs. Ransier as her bedroom. When they saw Mrs. Ransier lying on the bed and observed her condition, they immediately went downstairs and called the police.

When the police arrived they found Mrs. Ransier's body on the bed with her feet dangling over the side. They found eighteen stab wounds in the body and there was a depression and fragmentation in the head area immediately behind the right ear. There was blood on her body and head, blood on the sheets, blood spattered on the adjacent wall, and a large pool of blood on the linoleum floor beside the bed. It was dry around the edges but still wet in the center.

A footprint in the pool of blood on the floor was observed, apparently pointing in the direction away from the bed. There were other footprints leading away from that point. After observing the size of these footprints, the officers asked to see Gary's foot, to which Mr. Fisher agreed.

He and the detective then went to Gary's room. When they looked at his foot, they observed what appeared to be blood on his right foot. In addition, toenail clippings were taken and tests disclosed human blood on them. Subsequently, an expert compared the footprints made on the lineoleum with footprints taken from Gary and he testified that they were the same. In addition, the expert identified as Gary's a fingerprint taken from the door frame leading into that room.

When the police arrived, Mrs. Fisher went to her son's room and awakened him, telling him that someone had stabbed and killed Mrs. Ransier. Gary remained in his room and later when his father and the detective entered his room, he said, "I didn't

kill anyone." He first told his father and the officer that he had not gone upstairs. When the blood was discovered on his foot, he first said that this had come from a small sore on his leg below the knee which he had discovered bleeding after his bath and which he had wiped off on the bath towel in the basement. However, he soon told his father and the officer that he had been upstairs and that he had done so when he heard the front door open and soon heard the squeal of some car tires. He stated that he went upstairs to see whether Mrs. Ransier had left the house, leaving her children alone. He stated that the hall light was out, but when he entered the room and went close to the bed, he could see that Mrs. Ransier was on the bed, and he then turned around and went back downstairs. He said that at that time he remembered that he hadn't drained the tub and that he went to do that and was in the basement in the process of doing that when his mother called to ask what he was doing.

Gary was wearing short sleeved, short legged pajamas that night. The officers noticed numerous spots on the front of the pants and shirt but none on the back thereof. These were taken for analysis and the police expert testified that he was able to ascertain that these spots were blood of human origin. It was not enough, however, to ascertain the type.

A towel was recovered from the basement which Gary had used. It had two spots which were ascertained by the police expert to have been made by blood of human origin. Gary's explanation was that when he took his bath a small sore on his leg was caused to bleed and the blood on the towel came from that sore.

The stab wounds appeared to have been made by a knife. The officers observed a knife holder in the kitchen on the side of the kitchen cabinet and took a knife which was observed to have some stain on it which to them appeared to be blood. It was taken for examination and fingerprinting, but the expert was unable from the amount thereon to obtain any fingerprints or to ascertain whether it was human blood. However, they did notice that some small pieces of the blade were broken off. Subsequently, an X-ray of the body of Mrs. Ransier revealed two small pieces of metal just below the right clavicle of the anterior portion of the body. Two small slivers of stainless steel then were removed from Mrs. Ransier's body and were compared with the knife from the Fisher kitchen. The officer examined and photographed the knife and these pieces and testified that the small pieces of stainless steel removed from Mrs. Ransier's body came from the knife in question.

The medical evidence indicated that the indentation and fragmentation of the head area was caused by a blunt instrument such as a hammer. The evidence was that these wounds were inflicted subsequent to the stabbing. A hammer was found in the Fisher home in a closet between the kitchen and the TV room. When it was recovered, there appeared to be blood on it and what appeared to be fragments of fingerprints, but the ridges were not sufficiently discernible to permit identification.

When Mrs. Ransier's body was discovered and checked by the police at about 5:45 a. m., rigor mortis had set in but there was no decomposition. The time of death was estimated by the medical examiner at not less than three hours nor more than ten hours from the time the police arrived. This would have been sometime between 7:45 p. m. on September 2 and 2:45 a. m. on September 3.

Counsel urges that Gary's guilt was not established beyond a reasonable doubt. In that connection, he points out that the side door of the Fisher house was unlocked between 4:15 and 10:00 p. m., during which time someone could have entered the house and murdered Mrs. Ransier. Furthermore, a woman who testified for the defense stated that at about 1:30 a. m., she saw a man jump off the Fisher porch. He ran in front of her car which brushed him and knocked him down. He then got up and

ran. Counsel points out that this was about the time that Gary testified that he heard the front door open and heard tire squeals. Furthermore, Gary's father testified that the front door of the house was open the next morning. Counsel also urges the lack of any motive for Gary to kill Mrs. Ransier, and that there was motive shown with respect to relatives and friends.

These were things for the Juvenile Court to weigh and consider in deciding this case, but they do not result in a lack of sufficient evidence from which the Juvenile Court could find guilt beyond a reasonable doubt. The evidence, even though circumstantial, was very strong. Without detailing it all, we point out that it placed Gary upstairs in the room where Mrs. Ransier was killed at a time within the period of probable death. It established his footprint in the pool of blood near the bed and blood spots on the front of his pajamas (but not the back). It indicated blood on his bath towel and the fact that he was running water in the bathtub at about the time when Mrs. Ransier likely was killed. It clearly established that the murder weapon was a knife in a holder found in the kitchen of the Fisher house the next morning, and that a hammer on which there were stains and which was also found in a closet probably was the blunt instrument which was used. It established the fact that Gary lied to his father and to the officer about whether he had been upstairs the night before and also the source of the blood which was found on his foot.

■ We hold that the evidence was sufficient to sustain a finding that Gary was guilty beyond a reasonable doubt of killing Kay Ransier.

■ The second question for decision is whether the Juvenile Court violated Gary's constitutional rights when it denied his request for a jury trial. Defendant reasons from the decisions in Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491; In re Gault, 387 U.S. 1, 87 S.Ct. 1428,

18 L.Ed.2d 527; and Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84, that Art. III, § 2, and the Sixth and Seventh Amendments to the Constitution of the United States guarantee a jury trial in juvenile proceedings wherein the child is alleged to have committed an act which would be a felony if committed by an adult. This question has been settled by the decision of the Supreme Court of the United States in McKeiver v. Pennsylvania, decided June 21, 1971, 403 U.S. ——, 91 S.Ct. 1976, 29 L.Ed.2d 647, wherein the court held that the Constitution of the United States does not require a jury trial in delinquency proceedings in the juvenile court.

■ Defendant also urges that such jury trial is guaranteed by Art. I, § 18(a), of the Constitution of Missouri, 1945. This court in the case of State v. Heath, 352 Mo. 1147, 181 S.W.2d 517, held that the Missouri Constitution does not require a jury trial in delinquency cases in the juvenile court. We reaffirm that conclusion.

Judgment affirmed.

All of the Judges concur.