In the Interest of J——— M———, a child under seventeen years of age.

J——— M———, Appellant,

v.

Leon WALLACE, Juvenile Officer of Jasper County, Respondent.

No. 16998.

Missouri Court of Appeals,
Southern District,
Division One.

July 9, 1991.

926

Phillip A. Glades, Joplin, for appellant.

Trina J. Scott, Joplin, for respondent.

CROW, Judge.

The Juvenile Officer of Jasper County filed a petition praying the Juvenile Division of the Circuit Court of that county to exercise jurisdiction over J____ M____ ("J____"), date of birth December 5, 1973, per § 211.031.1(3), RSMo Cum.Supp.1989,[1] because J____, in violation of § 565.050, RSMo 1986, committed the class A felony of assault in the first degree, in that on or about January 28, 1990, he "knowingly caused serious physical injury to Chad Ward by repeatedly beating his head into the driveway."

The Juvenile Division, henceforth referred to as "the trial court," conducted an evidentiary hearing at which J____ and his parents appeared, represented by counsel. Thereafter, on April 26, 1990, the trial court entered an order taking jurisdiction of J____.[2]

1. Section 211.031 reads:
"1. ... the juvenile court shall have exclusive original jurisdiction in proceedings:
....
(3) Involving any child who is alleged to have violated a state law...."

2. The segment of the order pertinent to this appeal reads:
"The Court ... takes jurisdiction over the juvenile ... because it believes the allegations in the Petition are true and specifically finds beyond a reasonable doubt that the victim's injury (ies) were sustained when the juvenile continued to hit the victim's head against the pavement after victim was either unconscious or incapacitated from juvenile's first punches and the victim's high alcohol level; that witness Casey Cole's version of the assault is most consistent with the resultant injuries; that the compelling medical evidence indicat-

At a subsequent "disposition" hearing, the trial court placed J____ on probation subject to certain conditions including specified community service and restitution to the victim for medical expenses and lost wages.

J____ appeals, presenting four assignments of error. The first asserts the trial court failed to make some essential findings. The other three challenge the sufficiency of the evidence to establish guilt of assault in the first degree.

■ In determining whether the evidence was sufficient to support a finding that J____ was guilty of the alleged assault, we treat the trial court's finding as equivalent to a jury verdict, and we consider the evidence and inferences to be drawn therefrom in the light most favorable thereto. *In re Fisher*, 468 S.W.2d 198, 199–200[1] (Mo.1971).

The events culminating in the alleged assault began some time earlier. Chad Ward, born January 28, 1971, admitted he had not liked J____ "for a long period of time." Ward had told others this, and had said he wanted to fight J____.

J____, almost three years younger than Ward, testified he had been afraid of Ward since he (J____) was 13 or 14.

An incident illustrating the precarious relationship occurred in December, 1989. Ward was "out riding around" with three other young men: Casey Cole, Danny Clemons, and Jason James. They "pulled up" behind an automobile driven by Amy Cupp. Chris Torres was in the passenger seat of Amy's vehicle; J____ was in the back seat with Julie Dunn, described as James' "girlfriend."

J____ testified James "got out of his car and ... took a ... can of beer and just smashed it on the back of Amy Cupp's window."

Amy drove to a grocery store, pulled into the parking lot, and Julie got out. Amy and her remaining passengers departed.

Julie entered the car occupied by James, Ward, and their companions. She told James that Amy and her passengers were going to a party "in Sunnyvale."

James, Ward, Cole and Clemons, accompanied by Julie, drove to the Sunnyvale address. Ward testified, "We got out of the car and we went up there, and then some guys came out." The "guys" included Steve Davis and J____.

James and J____ "started exchanging words." According to Cole, James was jealous because J____ had been sitting beside Julie in Amy's car.

J____ testified: "[Ward] was yelling in the background kick his ass, and he's a puss, trying to get his friend [James] to fight me.... [Ward] was yelling cuss words, he was calling me names and stuff."

Ward testified Steve Davis' older brother came outside and told Ward and his companions to leave "because he didn't want nothing going on at his house." Then, said Ward, "someone attacked me from behind." Ward did not see who.

There was conflicting evidence on the identity of the attacker. J____ testified he did not touch Ward. Cole testified he saw nothing happen between J____ and Ward. Clemons testified J____ pushed Ward down.

Ward got up and was angry. Clemons "got a hold of him and got him in the car." Clemons, Ward, Cole and James departed.

Another incident occurred December 30, 1989. J____ and Dorothy Duffy entered Dillon's grocery store to purchase some items for Dorothy's mother. Ward, who was employed there, approached them. Dorothy testified Ward yelled at J____, "I need to talk to you." According to Dorothy, J____ replied, "I don't think you spray painted my car."[3] Dorothy quoted Ward as saying he wanted to fight J____.

ing that the victim's head was soft or mushy and that he had numerous contusions and abrasions in corroberative [sic] of and consistent with the testimony of said Casey Cole and inconsistent with juvenile's evidence and account of the assault."

3. Evidently, someone vandalized J____'s car prior to the incident at Dillon's. The culprit was not caught.

Ward testified the confrontation at Dillon's was the first time he had seen J____ since the Sunnyvale incident. Ward recounted he asked J____ about that incident, and J____ replied he had hit Ward only once. Then, said Ward, "I told him I ought to hit him, but I'm at work." Asked whether J____ said anything else, Ward responded, "He said he didn't want any trouble from me."

Cole testified he was present during the Dillon's incident. His testimony generally paralleled Ward's account. However, Cole also recalled J____ saying to Ward, "Well, I ought to kick your ass." Then, said Cole, J____ turned to him and remarked, "Man, I don't want to fight him."

J____ testified Ward said he got off work at ten o'clock and wanted J____ to meet him because "he was going to fight me." J____ added, "[Ward] called me dick and pussy, and he said he would hit me if he wasn't at work." Then, said J____, Ward started upstairs to the "break room." J____ told Ward he (J____) was not going to be there and was not going to fight him.

Mike Bower, a Dillon's employee, testified Ward screamed at J____ from the top of the stairs, "Just come back here at ten."

A third incident occurred on a night in mid-January, 1990. J____ and a friend, Bill McBride, drove into the parking lot at a bowling alley to see whether any friends' cars were there. A car pulled in and flashed its headlights. It was driven by Ward; Cole was a passenger.

J____ "took off as fast as I could." Ward and Cole gave chase, but ultimately abandoned it.

In their testimony, Ward and Cole admitted the pursuit. However, added Ward, "I only chased him for a couple of blocks." Cole recalled that when J____ fled, Ward said, "Well, I guess that's the end, he doesn't want to fight."

On Saturday night, January 27, 1990, Ward and Cole went to a "party" at a house in Joplin. Michelle Borusheski, "girlfriend" of Ralph McBride (older brother of Bill McBride) was "house sitting" the dwelling for the owners, who were evidently out of town. Ralph McBride arrived "approximately nine o'clock," after Cole and Ward.

The same evening J____ and a friend, Kye Young, both sophomores in high school, attended a basketball game. Afterward, they went to Bill McBride's place of employment. Bill, also a sophomore, joined the duo when he got off work at ten.

Bill, a member of the golf team, suggested they play the next day and his brother Ralph would play with them. Bill assumed Ralph was at the house Michelle was overseeing, so he suggested going there.

J____, Bill McBride, and Kye Young arrived at the house around 10:30. Cole answered the doorbell and, upon seeing J____, said, "Hey, J____, Chad is here."

Bill McBride and Kye Young entered. J____ "turned right around and left."

Kye Young testified Ward made "comments" about J____. Kye's testimony:

"Q. What names did he call him?
. . . .
A. Dick head, that if he came back he was going to get him.
. . . .
Q. Did he say anything about hating him?
A. Yeah, he said, you know, he hated him and he was going to get him, you know, and called him names, vulgar names."

Bill McBride also recalled remarks by Ward about J____. Bill's testimony:

"[Ward] was just saying that, you know, how he was going to kick his butt. But he used another word for it. . . .
Q. How many times did he say he was going to kick his ass?
A. I couldn't really tell you.
Q. Did he say anything about hating him?
A. He just kept going on."

J____ "drove around" some 10 or 15 minutes, then returned to the house to pick up Bill McBride and Kye Young because they had no ride home.

Asked what occurred when J____ entered, Kye testified:

"The first thing, [J____] walked in and Chad goes, he said; 'Hey dick head.' And [J____] goes; 'Hi, Chad,' real nice about it. And [J____] goes; 'Guys, we need to leave,' and so we left."

Bill and Ralph McBride confirmed Kye's account of the colloquy between J____ and Ward. Ralph added that after J____, Bill, and Kye departed, Ward said he "wanted to kick J____'s ass."

Cole testified Ward "had quite a bit to drink" at the party, as Ward was "celebrating because his birthday was Sunday."

Ward avowed he "was pretty much intoxicated." He recalled J____ and "another guy or two other guys" arriving, but "didn't pay any attention to them."

Upon leaving the party, J____ took Kye Young home. J____ then drove himself and Bill McBride to J____'s residence, arriving some 15 minutes after leaving the party. No one else was there when J____ and Bill went inside.

Meanwhile, according to Ralph McBride, Ward had telephoned J____'s home and left a message on the answering machine. It was "something like I am going to kick your ass, you're a dick, you're an a_____, along those lines." [4]

J____ testified that some time after arriving home he noticed the answering machine blinking. Upon listening to the message, he recognized Ward's voice. Asked to quote the message, J____ responded:

"He said, ... 'This is Chad and I'm going to kick your ass, and you're a dick and a f_____ pussy.' And he went on and on just saying practically the same thing over and over again.

Q. On this occasion when you were listening to the answering machine, did he say anything ... about killing you?

A. Yeah, he said that repeatedly.

. . . .

Q. Did this frighten you?

A. Yeah, he's bigger than me and older."

J____ told Bill McBride about Ward's message. Bill suggested J____ phone Ward and try to "settle it over the phone." At J____'s request, Bill phoned his mother and obtained the phone number of the house where the party was in progress. [5]

J____ placed the call. Cole answered. J____ asked for Ward. Cole summoned him. Cole remained within earshot. Cole testified, "They were just yelling at each other, you know, just fighting."

Ward testified he remembered J____ calling. Then, this:

"Q. Did you talk to him over the phone?

A. Yeah.

Q. Do you know what he said?

A. I really don't."

J____ gave this account of the conversation:

"I said, 'Chad, this has been going on for a long time and I just really would like it if it was all over with, and I don't want any more of this.'

. . . .

Q. When you called him ... you tried to say the things that you have just testified to, what did he say to you?

A. He was calling me names and things, he wouldn't reason with me, he was yelling and things like that.

Q. What did he say he was going to do?

A. He goes, 'Are you at home?' And I go, 'No, I'm not here, I'm not at home.' And he goes, 'Well, I'm coming over to your house,' and I go, 'I'm not here, I'm not at home.' And he said, 'I'm coming over and I'm going to kill you.' And I go, 'Don't come over here,' and he goes, 'I'm coming over and I am going to kill you.' And he hung up the phone."

Cole testified, "[Ward] slammed the phone down and looked at me and said let's go."

Heather Hale, Cole's "girlfriend," had arrived at the party site to see Cole.

---

**4.** Ralph, who was still at the party, was listening to Ward's call on "the other line."

**5.** The mother of Bill and Ralph McBride knew the number, as it was the temporary residence of Ralph's girl friend.

930

Heather testified Cole and Ward came outside and sat in her car. She described Ward as extremely drunk. Then, this:

"Q. Heather, while [Ward] was in the car talking, did he make any statements to you about what he was going to do to [J____] that night?

A. Yes.

. . . .

Q. What did he say he was going to do?

A. Kill [J____].

. . . .

Q. Tell the judge some of the things he said to you about [J____].

A. That he was a f____ a____; that he hated him; that he wanted to kill him; he wanted to kick his ass; wanted to kill him, things like that.

. . . .

Q. Did Chad then get out of the car?

A. Yes.

Q. Did he leave with Casey?

A. Yes.

. . . .

Q. Was Chad driving?

A. Yes."

Cole confirmed the incident in Heather's car, recalling Ward saying he hated J____ and was going to kill him. Cole recounted that after he and Ward exited Heather's car, they got in Ward's car and Ward drove to J____'s residence.

Ward testified he recalled getting in his car with Cole and starting to J____'s residence. Ward avowed the next thing he remembered was waking up in the hospital.

Meanwhile, after Ward hung up, J____ told Bill McBride that Ward was coming over. J____ asked Bill "to get someone over here because I don't know how many people he's going to bring or what he's going to do."

Bill telephoned the party site and informed his brother, Ralph, that Ward and possibly others were coming to J____'s house, and that he (Bill) and J____ were alone.

Ralph had overheard Ward's telephone conversation with J____. Asked what he heard, Ralph testified:

"Threats that he was going to kick his ass, how he was going to come over, he wanted to make sure [J____] was there because he was going to go over there...."

Asked about Ward's "propensity for violence," Ralph testified:

"I can safely say that I know he's been in several fights.

Q. Do you know what his reputation is?

A. Reputation of a fighter, maybe if you would say a trouble maker, I'd definitely say you could name him as being one.

Q. Does he have a reputation for being a bully?

A. Yes, I'd say so."

Upon receiving Bill's call, Ralph McBride and one of his friends, David Andrews, got in the latter's car and started toward J____'s residence.

Four individuals testified about what occurred when Ward and Cole reached J____'s home: Cole, Bill McBride, J____, and J____'s 23–year–old sister, who lived across the street with her husband. All agreed Ward drove into the driveway and got out. J____ came outside and approached Ward.

As noted earlier,[6] the trial court declared Cole's version of the alleged assault "most consistent with the resultant injuries." It is also the one most favorable to the trial court's finding. *Fisher*, 468 S.W.2d at 199–200[1]. Accordingly, we set forth Cole's account.

Cole testified J____ hit Ward once in the face with a "closed fist." Ward fell backward. J____ got atop Ward, grabbed his head, and "slammed it to the pavement about three or four times." Cole observed no effort by Ward to fight back, and did not see Ward touch J____. After the head slams, Ward lay motionless.

About that time, J____'s sister and her husband arrived at the driveway.

6. Footnote 2, *supra.*

Cole testified J____ said, "[L]ook what happened, take him to the hospital." Then, said Cole, J____ helped Cole pick up Ward and put him in the car. Cole drove Ward to a hospital. According to Cole, when they arrived Ward "was throwing up, still unconscious."

Hospital records show Ward arrived at 12:55 a.m., Sunday, January 28, 1990. The provisional diagnosis was "closed head injury" and "acute alcohol intoxication."

The emergency room physician testified: "[Ward] had what appeared to be multiple contusions in and around his head area. His head was real soft to touch, swollen with multiple contusions[.] ... [B]asically the whole right side of his head was involved, the right side of his eye and all the way around to the back of his head.... I initially suspected he might have a depressed skull fracture because of the—basically the mushiness of his head. When I felt it initially, it was very soft. And it's hard to tell when you do a physical examination to decide whether that's an injury that's external or internal, so we ordered a CT scan as soon as we could possibly get it done. It proved at that time to be purely an internal post-head injury with no skull fracture."

The physician concluded Ward "probably just had a concussion." The physician stabilized Ward and placed him in intensive care.

J____'s version of the altercation differed from Cole's. J____ testified he approached Ward and "had just begun to say something and he threw a punch at me." The punch did not land. Then, said J____, "[W]e were both kind of grabbing at each other, kind of wrestling." According to J____, both fell. J____ was on top. J____ continued, "He started punching at me and he grabbed me around my neck and started just squeezing and squeezing it, and that's when I just hit him, I just started hitting him."

Asked whether he remembered "banging" Ward's head into the pavement, J____ replied: "No, his head could have hit the pavement from me hitting him and then it going back into the pavement. But I didn't actually grab his head and just shove it into the pavement." J____ continued hitting Ward until Ward released J____'s neck. Then, said J____, "I got up."

Bill McBride watched the affray from the door of J____'s home. Bill confirmed J____'s testimony that the adversaries began scuffling and fell. Then, the car blocked Bill's view. Bill went to the rear of the car and saw J____ punch Ward twice, but did not see J____ slam Ward's head against the pavement. However, Bill conceded that later, J____ said he took Ward's head and "hit him on the concrete behind the car."

J____'s sister testified she witnessed the confrontation through a window in her home. She saw Ward come at J____ with a swing and then both fell to the ground, scuffling. The scuffling continued on the ground. She denied J____ pounded Ward's head into the concrete. The fight was over by the time she and her husband reached the driveway. After Cole departed with Ward, she saw "big claw marks" on the back of J____'s neck and some cuts on his knuckles.

J____'s brother-in-law observed the back of J____'s neck was "scratched up." Bill McBride recalled "a real big pink looking mark" across the back of J____'s neck after the fight.

J____'s parents arrived after Cole departed with Ward. J____'s mother saw "big claw marks" all the way across J____'s neck. They were "really dug in deep, deep claw marks."

J____'s father described the marks on J____'s neck as "pretty big welts or scratches on the back, from like maybe the top part of his back up the side of his neck."

Ward remained hospitalized until Friday, February 2, 1990, when he was taken home. On February 12, 1990, his mother took him to a hospital because he was experiencing severe pain in his head. Diagnostic procedures revealed "a right temporal intercerebral hematoma." It was surgically evacuated.

The surgeon concluded Ward "probably will have some loss of retention for recent events and could suffer some memory loss for recent events in the future." Additionally, "there is a 5–10% risk of seizures from this hematoma that could develop in the future."

At trial, Ward's mother testified he did not walk like he formerly did. Additionally, his facial expressions are different.

J____'s first point avers the trial court erred in taking jurisdiction over him in that the court failed to make findings on "two vital issues." One of them, according to J____, is whether he acted in lawful self-defense.

The Missouri law on self-defense is codified in § 563.031, RSMo 1986. It reads:

"1. A person may, subject to the provisions of subsection 2, use physical force upon another person when and to the extent he reasonably believes such to be necessary to defend himself ... from what he reasonably believes to be the use or imminent use of unlawful force by such other person, unless:

(1) The actor was the initial aggressor; except that in such case his use of force is nevertheless justifiable provided

. . . .

(c) The aggressor is justified under some other provision of this chapter or other provision of law;

. . . .

2. A person may not use deadly force upon another person under the circumstances specified in subsection 1 unless he reasonably believes that such deadly force is necessary to protect himself or another against death, serious physical injury, rape, sodomy or kidnapping.

. . . .

4. The defendant shall have the burden of injecting the issue of justification under this section."

The Comment by the Committee to Draft a Modern Criminal Code that follows this section reads, in pertinent part:

"A person who is assailed in a place in which he is entitled to be is not bound to retreat before exercising his right to self-defense, State v. Barlett [Bartlett], 170 Mo. 658, 71 S.W. 148 (1902). Thus, the law of self defense has been held to imply a right of attack when it appears reasonably necessary for protection against an impending assault, State v. McGee, 361 Mo. 309, 234 S.W.2d 587 (1950); followed in State v. Hicks, 438 S.W.2d 215 (Mo.1969). The Code retains the 'no retreat' rule. Of course, if a defendant stands his ground and uses force on another when he could have avoided injury or risk of injury by merely retreating, a jury would be entitled to take these circumstances into consideration when determining whether the defendant's belief in the necessity of using physical force was reasonable." Vol. 40, V.A.M.S. (1979), p. 288.

In Hicks, cited in the above excerpt, the accused shot and killed an individual who had threatened, assaulted, and chased him the preceding day. The evidence was in conflict about the circumstances of the shooting. One version was the victim made no move to attack the accused. Other versions indicated the victim manifested an imminent attack. In discussing the accused's right of self-defense, the Supreme Court of Missouri said:

"All of the evidence including that of the state tends to prove that the [accused] had reasonable cause to apprehend that [the victim] had a design, that is, a purpose or intention to inflict some great personal injury on the [accused]. No other interpretation could be put on the undisputed events of the day before. [The victim] physically assaulted the [accused] on the premises where the [accused] conducted his business and where he had a right to be.... While the [accused's] physical makeup is not specified, it is clear from the record that he was no match for [the victim] who was described as a 'giant' of a man. After the [accused] escaped from the first assault, [the victim] attacked again and the [accused] avoided him only by running from the premises and down the street until [the victim] was intercepted by the police patrol. The [accused's] apprehension and recognition of his physical inability

to protect himself and his desire to avoid [the victim] are indicated by his conduct on the following day....

*State v. McGee*, 361 Mo. 309, 234 S.W.2d 587, 591[6], recognizes the rule that the law of self-defense implies the right of attack when it reasonably appears necessary for protection against an impending assault, but it depends on necessity, real or apparent, and the danger must be imminent or reasonably appear to be so.

... the only material difference in the testimony of the witnesses was with regard to what [the victim] was doing or about to do when he was shot. There was persuasive evidence that the [accused] was in imminent danger of a harmful attack from [the victim]. A jury might very well have found that the [accused] was acting solely in self-defense, but we cannot so declare as a matter of law. The issue was one of fact for the jury...." 438 S.W.2d at 218 and 219.

 It is clear from *Hicks* that an individual who is where he has a right to be and reasonably believes he is in imminent danger of assault by another has the right of attack when it reasonably appears necessary for protection against the impending assault. The doctrine was articulated as early as *State v. Sloan*, 47 Mo. 604, 612 (1871), and *State v. Matthews*, 148 Mo. 185, 49 S.W. 1085 (1899). Both are factually similar to the instant case in that there was evidence to support a finding the accused could have reasonably feared he was in imminent danger of bodily harm by the victim. While *Sloan* and *Matthews* are homicide cases, the elements of self-defense are not materially different in a case where the charge is assault in the first degree. *State v. Moore*, 711 S.W.2d 533, 536–37[3] (Mo.App.1986).

 *Matthews* is cited in *State v. Daugherty*, 196 S.W.2d 627, 628[3] (Mo. 1946), which squarely holds a person about to be attacked may properly use force to prevent the attack, and is not bound to wait until his adversary strikes a blow. In resisting an assault, a person is not required

to determine with absolute certainty or nicely gauge the amount of force necessary for such purpose, but the law does exact of him that he shall not use any more force than shall reasonably appear to him in the circumstances to be necessary for such purpose. *State v. Rash*, 359 Mo. 215, 221 S.W.2d 124, 126[3] (1949).

In the instant case there was evidence of long-standing animosity by Ward toward J____. There was testimony Ward attempted to induce Jason James to fight J____ during the Sunnyvale incident. There was testimony Ward challenged J____ to a fight at Dillon's. Ward admitted pursuing J____ by automobile a fortnight before the tragic occurrence that spawned this case. There was testimony from Kye Young, Bill McBride, Ralph McBride, Heather Hale, J____, and even Cole, that on the night of the alleged assault Ward threatened bodily harm against J____. Such testimony served a duplicate role as evidence of who was the aggressor and as evidence as to whether J____ could have reasonably feared imminent injury by Ward at the time J____ resorted to physical force. *State v. Hafeli*, 715 S.W.2d 524, 530[9] (Mo.App.1986).

Ward, while professing intoxication, was nonetheless able to drive his automobile and find J____'s residence at midnight.[7] Ward went there, admittedly uninvited, after an acrimonious phone conversation with J____.

J____ could have reasonably assumed Ward believed he (J____) was alone, as there is no evidence anyone told Ward anything different.

We hold the evidence sufficient to support a finding that J____ could have reasonably believed (a) he was in imminent danger of an assault by Ward, and (b) it was essential that he (J____) strike the first blow to protect himself from the impending assault. The evidence was also sufficient to support a finding that J____ could have reasonably believed retreat was unwise, as Ward might have overtaken him from behind before he (J____) could get inside and lock the door.

---

7. There was evidence the distance from the par- ty site to J____'s home is some two miles.

**934**

Of course, whether J____ possessed these beliefs as he faced Ward in the driveway was for the trial court, not us, to determine.

The trial court's order does not address the subject of self-defense. It finds (1) the allegations of the petition are true, and (2) Ward's injuries were sustained when J____ continued to hit Ward's head against the pavement after Ward was either unconscious or incapacitated from J____'s first punches and Ward's intoxication.

Finding "2" was responsive to an issue at trial. As reported earlier, J____ denied grabbing Ward's head and slamming it against the pavement. According to J____, he was hitting Ward, and if Ward's head struck the pavement it was because J____'s blows propelled Ward's head downward.

The trial court, as was its prerogative, resolved this fact question against J____, finding Cole's account of the altercation "most consistent with the resultant injuries."

■ We must, of course, accept the trial court's resolution of this issue. Appellate review of a juvenile proceeding is the same as in other court-tried cases. *C.R.K. v. H.J.K.*, 672 S.W.2d 696, 698[1] (Mo.App.1984). In a court-tried case, credibility of the witnesses and the weight to be given their testimony is a matter for the trial court, which is free to believe none, part, or all of their testimony. *Herbert v. Harl*, 757 S.W.2d 585, 587[1] (Mo. banc 1988). We do not substitute our judgment for that of the trial court on credibility issues. *Strauss v. Strauss*, 755 S.W.2d 742, 743[1] (Mo.App.1988); *Estate of Graves*, 684 S.W.2d 925, 928[2] (Mo.App. 1985).

However, nothing in the record indicates the trial court, in deciding the issue of J____'s guilt or innocence, considered the law of self-defense as we have spelled it out in this opinion. In saying this, we do not overlook the written suggestions submitted to the trial court by the lawyer for the juvenile officer after the hearing. Those suggestions address the subject of self-defense generally, but do not cover the doctrine that allows one who reasonably believes he is in imminent danger of assault to attack his adversary when it reasonably appears necessary for protection against the impending assault. That was the pivotal issue in this case.[8]

■ In a juvenile proceeding, where the petition alleges as a basis for jurisdiction that the juvenile committed an act which would constitute a crime if committed by an adult, due process requires proof of the accusation beyond a reasonable doubt. *In Interest of J.L.P.*, 600 S.W.2d 47, 50[4] (Mo.App.1980), citing *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). *See: Fisher*, 468 S.W.2d at 199. This is the standard required by Rule 117.-05.a, Missouri Rules of Practice and Procedure in Juvenile Court (1990).

■ Self-defense is a special negative defense. *State v. Miller*, 653 S.W.2d 222, 224 (Mo.App.1983). The burden is on the accused to inject the issue in the case. *Id.* at 224[1]. If he does, the burden is on the prosecution to prove the absence of self-defense beyond a reasonable doubt. *Id.*

We have held the issue of self-defense was raised by the evidence. Consequently, it was the juvenile officer's burden to prove beyond a reasonable doubt that J____, in using force against Ward, did not act in lawful self-defense.

Had this been a jury trial, and had the jury been properly instructed, the law of self-defense would have been submitted by MAI–CR 3d 306.06. In such circumstances, the record would confirm the factfinder was properly informed of the principles of self-defense set forth in this opinion.

■ Here, however, no such showing appears. Absent a finding on the self-defense issue, we cannot determine whether the trial court correctly applied the law to the evidence the court deemed credible.

**8.** Inexplicably, J____'s lawyer, though afforded the opportunity, filed no suggestions with the trial court.

Section 211.181.3, RSMo Cum.Supp.1989, provides that when a juvenile is found by the court to come within the provisions of § 211.031.1(3), the court shall so decree "and make a finding of fact upon which it exercises its jurisdiction" over the juvenile. The recommended form for a finding of jurisdiction by the Juvenile Division appears in Rule 128.13. The Note on Use beneath the form states the finding should not simply reiterate the allegations of the petition, but should state concisely the facts as found by the court.

We do not imply every finding of jurisdiction in a juvenile proceeding must include exhaustive factual detail, nor do we suggest every finding must address every conceivable defense or mitigating circumstance.

In this case, however, the pivotal issue was whether J____'s use of force against Ward was justifiable under the law of self-defense as set forth in this opinion. We hold the trial court's order should have, in some manner, resolved that issue. The exercise of jurisdiction over J____ hinged on it.

It follows that the trial court's order exercising jurisdiction over J____ must be reversed and the cause must be remanded for entry of an order that includes a finding on the self-defense issue. Such finding, of course, depends on the trial court's proper application of the law of self-defense to the evidence the court deems credible. As observed earlier, assessing credibility is a task for the trial court, not us.

Having reached this conclusion, we need not address the other challenge to the trial court's order in J____'s first point.

J____'s three remaining points assert the evidence was insufficient to establish guilt of assault in the first degree beyond a reasonable doubt. We need not capsulize the arguments advanced in support of these points. All boil down to issues of credibility and persuasiveness of the evidence—the trial court's domain, not ours. These points are denied.

The order of the trial court taking jurisdiction of J____ is reversed and the cause is remanded for the purpose set forth in this opinion.

PREWITT, J., concurs.

MAUS, P.J., concurs and files concurring opinion.

MAUS, Judge, concurring.

I concur. There is evidence from which the trial court could conclude J____ acted in self-defense as defined in § 563.031. There is also evidence from which the trial court could find J____ continued to hit Ward's head against the pavement after Ward was unconscious or incapacitated and conclude J____ could not reasonably believe such force "to be necessary to defend himself." See *State v. Jackson*, 452 So.2d 1225 (La. App. 2 Cir.1984). J____ did inject the issue of self-defense. § 556.051.

The fact J____ did not act in self-defense was thereby made an element of the offense of assault. When an element is in doubt, a juvenile court should find that element to have been established beyond a reasonable doubt. The instructions in MAI–CR 3d can be used for help in identifying the elements of the offense and formulating such a finding.