In re the MARRIAGE OF Joyce
Ann EDWARDS and Hugh
Kingston Edwards.

Joyce Ann EDWARDS, Petitioner–
Respondent–Appellant,

v.

Hugh Kingston EDWARDS, Respondent–
Appellant–Respondent.

Nos. 17626, 17637.

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 16, 1992.

Christopher J. Stark, Springfield, for Hugh Kingston Edwards.

Kay S. Graff, Springfield, for Joyce Ann Edwards.

CROW, Presiding Judge.

By an amended decree entered June 12, 1991, the trial court dissolved the 28–year marriage of Joyce Ann Edwards and Hugh Kingston Edwards.

Among its provisions, the decree (a) awarded Hugh[1] primary physical custody of the parties' 17–year–old daughter, (b) ordered Joyce to pay Hugh $115 per month child support for the daughter, (c) ordered Hugh to pay Joyce $500 per month maintenance, (d) ordered Hugh to pay Joyce's lawyer $3,000, and (e) awarded Joyce $1,000 per month as her share of Hugh's pension "under the terms of the Qualified Domestic Relations Order entered herein."

Hugh brings appeal 17626 from the decree, averring the trial court erred in: (I) finding the younger of the parties' two sons (born May 12, 1971) was emancipated, (II) awarding Joyce maintenance in that she failed to meet the eligibility requirements of § 452.335,[2] (III) setting the main-

tenance at $500 per month in that such sum is excessive under the standards of § 452.-335, and (IV) awarding Joyce an interest in his pension.

Joyce brings appeal 17637 from the decree, maintaining the trial court erred in: (I) setting the maintenance at $500 per month in that such sum is insufficient under the standards of § 452.335, and (II) awarding her lawyer just $3,000 in that the evidence supported a greater amount.

■ The scope of our review of this judge-tried case is established by Rule 73.-01(c)[3] as construed by *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). The decree of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Id.* at 32[1]. Credibility of the witnesses and the weight to be given their testimony was a matter for the trial court, which was free to believe none, part, or all of their testimony. *Herbert v. Harl,* 757 S.W.2d 585, 587[1] (Mo. banc 1988). We do not substitute our judgment for that of the trial court on credibility issues. *In Interest of J___ M___,* 812 S.W.2d 925, 934[6] (Mo.App.1991); *Strauss v. Strauss,* 755 S.W.2d 742, 743[1] (Mo.App.1988); *Stratton v. Stratton,* 694 S.W.2d 510, 512[2] (Mo.App.1985).

Applying these principles to the record here, we find no error in any respect complained of by Hugh in points I, II and III in his appeal, and likewise find no error in any respect complained of by Joyce in either of the points in her appeal. As to all such issues, the decree is supported by substantial evidence, is not against the weight of the evidence, and no error of law appears. An opinion fully discussing the law and evidence pertinent to such issues would have no precedential value. Accordingly, the portions of the decree attacked by those points are affirmed in compliance with Rule 84.16(b). The remainder of this

---

1. For convenience and clarity, we henceforth refer to the parties by their respective first names.

2. References to statutes are to RSMo Cum.Supp. 1990.

3. Rule references are to Missouri Rules of Civil Procedure (1992).

opinion is devoted exclusively to point IV of Hugh's appeal, which assails the portion of the decree pertaining to his pension.

Hugh is employed by ROLM Company. At trial, he identified Petitioner's Exhibit 2 as a statement of his pension benefits under the "ROLM Retirement Plan" ("the Plan"). The pension is the primary marital asset.

According to Exhibit 2, Hugh's vested pension rights as of December 31, 1989, will yield him an estimated annual retirement income of $13,410. Hugh testified, "[T]hat's the amount of money that I will receive at age sixty-five should I leave the company today."

Exhibit 2 sets forth certain "Retirement Income Assumptions." One of them is:

The retirement figures shown in this statement are based on your age, earnings and service through December 31, 1989 and on continued service to the ages indicated. Your annual salary at year end 1989 was used as the starting point for all projected future earnings.

Exhibit 2 then shows:

Estimated Annual Retirement Income (Single Life Basis)

| Ages | 65 | 62 | 60 | 55 |
|---|---|---|---|---|
| Estimated Retirement at 0% Salary Growth: | $35,149 | $32,435 | $30,623 | $23,130 |
| Social Security* | $23,592 | $17,316 | NA | NA |
| Total | $58,741 | $49,751 | $30,623 | $23,130 |
| Value in Current Dollars | $28,172 | $26,969 | $18,012 | $16,685 |

....

Note: Value in current dollars was derived using a 4 percent discount rate....
* Since the earliest eligibility date to receive social security retirement income benefits is normally age 62, these benefits are not applicable at earlier ages.

---

The trial court's findings regarding the Plan appear in paragraph 12 of the amended decree, which reads:

That the monthly marital pension benefits available to [Hugh] through ROLM Company ... would be $1927.50 at age 55, $2551.92 at age 60, $2702.92 at age 62 and $2929.00 at age 65 and the portion due [Joyce] as her marital property is $1000.00 per month to be paid pursuant to a Qualified Domestic Relations Order.

In conjunction with the decree, the trial court signed and filed a four-page document captioned "Qualified Domestic Relations Order" (of which more later).

In arriving at its findings (quoted above), the trial court evidently assumed Hugh (a) would continue working for ROLM Company until at least age 55 [4], and (b) would have zero percent salary growth. In computing Hugh's monthly pension benefits for the respective ages of 55, 60, 62 and 65, the trial court obviously used the estimated annual retirement income on the first line of the above chart for those ages, divided by 12.

Hugh's point IV reads:

The trial court erred in finding that the monthly marital pension benefits available to [Hugh] through ROLM Company ... would be $19,027.50 [sic] at age 55, $25,051.92 [sic] at age 60, $27,002.92 [sic] at age 62 and $29,029.00 [sic] at age 65, and the portion due [Joyce] as her marital property is $1,000.00 per month to be paid pursuant to a Qualified Domestic Relations Order in that the finding by the court is unsupported by competent evidence, and the Qualified Domestic Relations Order does not comply with section 414(p)(C) [sic] of the Internal Revenue Code.

4. At trial (April 29, 1991), Hugh testified he is 47 years old. Exhibit 2 shows he was born July 30, 1943.

Rule 84.04(d) reads, in pertinent part:

> The points relied on shall state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous....

The purpose of the rule and the necessity of obeying it are extensively discussed in the leading case of *Thummel v. King,* 570 S.W.2d 679, 684–88 (Mo. banc 1978).

Hugh's point IV yields no clue as to wherein and why the trial court's findings regarding the pension are unsupported by competent evidence, and furnishes no hint as to wherein and why the Qualified Domestic Relations Order (henceforth "QDRO") does not comply with "section 414(p)(C)"[5] of the Internal Revenue Code. The point therefore presents nothing for review. *Carthen v. Jewish Hospital of St. Louis,* 694 S.W.2d 787, 796[4] (Mo.App. 1985); *Best v. Culhane,* 677 S.W.2d 390, 394[4] (Mo.App.1984); *Tripp v. Harryman,* 613 S.W.2d 943, 950[12] (Mo.App.1981).

However, because the pension is the primary marital asset, we have, ex gratia, scrutinized the argument portion of the brief in an attempt to extract the hypotheses of error.

Hugh's first complaint, as we divine it, is that the pension "is contingent upon his surviving until age 65." Consequently, the pension "is subject to divestment or is contingent upon some future event." Thus, argues Hugh, "there is no property to divide."

Pertinent to this contention, we note Exhibit 2 shows Hugh's "date of hire" as November 17, 1969. Accordingly, at time of trial he had accrued 21 years and 5 months service. Exhibit 2 states:

> If you leave ROLM before retirement with at least 5 years of service, you will have vested rights (that is, you will be entitled) to a retirement income at age 65. With 15 years of service, reduced benefits are available as early as age 55....

It is thus certain that Hugh's pension rights are vested. He conceded this at trial and in his brief. Additionally, it appears that should he elect, he can begin collecting a pension as early as age 55, albeit a lesser amount than if he retires later.

In *Kuchta v. Kuchta,* 636 S.W.2d 663 (Mo. banc 1982), the Supreme Court of Missouri addressed the division of pension rights constituting marital property, categorizing them in three "stages." *Id.* at 665. Hugh's pension rights fall in the "Stage II" category:

> If the employment were terminated, and the spouse was entitled to receive certain benefits beyond prior contributions, but only after reaching a designated retirement age, such retirement benefits would be "vested" but "non-matured." *Id.*

Hugh's vested pension rights are non-matured in that he has not yet reached the age at which benefits are payable. Hugh's pension rights are nonetheless marital property, having been acquired in toto during the marriage. *Id.* at 666[3]; *Klenke v. Klenke,* 742 S.W.2d 621, 623[1] (Mo.App. 1987); *Lynch v. Lynch,* 665 S.W.2d 20, 23[1] (Mo.App.1983). Hugh's theory that there was "no property to divide" in his Stage II pension rights is without merit. The two cases cited by Hugh in support of that theory, *Delay v. Delay,* 612 S.W.2d 391 (Mo.App.1981), and *In re Marriage of Faulkner,* 582 S.W.2d 292 (Mo.App.1979), antedate *Kuchta.* Since *Kuchta,* it is settled that a spouse's interest in a pension plan acquired during marriage is marital property even though such interest is contingent or subject to divestment. *Hahn v. Hahn,* 732 S.W.2d 545, 546[1] (Mo.App. 1987); *Mills v. Mills,* 663 S.W.2d 369, 372[5] (Mo.App.1983).

Alternatively, Hugh argues, "If the court decides to award Joyce ... any portion of [Hugh's] retirement, then that award should be based on the value at the time of the separation[6] and should be pay-

---

5. We find no section 414(p)(C) in the Internal Revenue Code. We glean from the argument portion of Hugh's brief that the section to which he intends to refer is 26 U.S.C.A. § 414(p)(2)(C).

6. The parties separated in November, 1986.

able only when the retirement is available to Hugh ... for distribution upon reaching age 65 in accordance with a qualified domestic relations order."

■ The QDRO entered by the trial court identifies Hugh as "[P]articipant" and identifies Joyce as "Alternate Payee." The QDRO reads, in pertinent part:

. . . .

7. The marital property component of the Plan is the accrued pension benefit as of April 29, 1991. The portion to be allocated to Alternate Payee is $1000.00 per month of the marital property component.

8. The specified pension benefit shall be payable to the Alternate Payee and shall commence as soon as administratively feasible on or about the date Participant actually retires or otherwise enters pension status for wahtever [sic] reason, or as soon as may be otherwise available at request of Alternate Payee.

9. The payments shall commence at the earliest possible time Participant can qualify to cause said payments to be made to Alternate Payee.

10. The term of the regular monthly pension payments to Alternate Payee is for the life of the Participant. The Alternate Payee shall be the beneficiary of 50% of any post-retirement death benefits accrued to Participant as of April 29, 1991, if the Participant, after retirement predeceases Alternate Payee....

. . . .

12. The Alternate Payee shall have the same rights with regard to her portion of the Plan as are available to the Participant with regard to his remaining portion of the Plan. In no event shall the Alternate Payee have greater rights than those which are available to the Participant.

. . . .

Hugh maintains paragraphs 8 and 9 of the QDRO "are inconsistent with respect to the time at which the [P]lan is directed to commence paying benefits to [Joyce]."

As we understand paragraph 7 of the QDRO, it awards Joyce $1,000 per month as her share of Hugh's pension.

Paragraph 8 of the QDRO begins by stating Joyce's share shall be payable as soon as administratively feasible on or about the date Hugh actually retires or otherwise enters pension status. However, paragraph 8 ends with the proviso: "or as soon as may be otherwise available at request of Alternate Payee."

In 2 *Mo. Family Law*, § 15.19 (MoBar 4th ed. 1988), it is explained:

The [Retirement Equity] Act [of 1984] does clearly provide that a state divorce court may not reach assets held by a plan unless those assets are otherwise available to the participant pursuant to the terms of the plan. The only exception to this provision relates to payments which may begin on or after the date on which the participant attains the earliest retirement age under the plan, whether or not the participant actually retires on that date[.]

As authority for the above statement, the author cites § 206(d)(3)(E) of the Employee Retirement Income Security Act of 1974 ("ERISA"), codified as 29 U.S.C.A. § 1056(d)(3)(E). The author continues:

Generally, the definition of a qualified domestic relations order is broad enough to include one under which the plan is ordered to provide to a nonemployee spouse with his or her share of the employee's benefits in any form authorized by the plan at the election of the nonemployee spouse. Seemingly, the court is not restricted to awarding the nonemployee spouse an amount or percentage of a benefit that is elected by the employee. Further, there are no restrictions on the power of the court to divide the benefits, and the early retirement rule clearly contemplates awarding a benefit to the nonemployee (other than a joint and survivor annuity with a subsequent spouse) that has not been elected by the employee.

. . . .

... a qualified domestic relations order may not provide for any type or form of benefit not otherwise provided in the plan. There exists, however, one statutory exception for the qualified domestic

relations order. Even though the participant may not have actually retired, the order may require payment to commence to the alternate payee on or after the date at which the participant attains or would have attained "earliest retirement age."

In *May v. May*, 801 S.W.2d 728, 735–36 (Mo.App.1990), the Eastern District of this Court said:

The Retirement Equity Act of 1984 amended ERISA and the Internal Revenue Code, which previously prohibited assignment of benefits, to allow such assignment to an "alternate payee" pursuant to a QDRO. Under a QDRO the "alternate payee" may only receive benefits in the manner, form and the time available to the participant. 29 U.S.C. § 1056(d)(3)(D); 26 U.S.C. § 414(p)(3).

The Eastern District then noted one exception, i.e., payments which may be made on or after the date the participant attains the earliest retirement age. 29 U.S.C.A. § 1056(d)(3)(E); 26 U.S.C.A. § 414(p)(4). *May*, 801 S.W.2d at 736 n. 1.

Here, it appears the trial court intended to grant Joyce the option to begin receiving her $1,000–per–month share of Hugh's pension as soon as he attains the age at which benefits first become payable to him under the Plan (apparently 55). While the QDRO might have been more precise, we believe it should be construed to mean Joyce shall receive $1,000 per month from the Plan upon the occurrence of any of the following events, whichever happens first: (1) Hugh retires, or (2) Hugh otherwise enters pension status, or (3) Hugh reaches an age at which he is eligible for pension benefits under the Plan and Joyce elects to begin receiving the share awarded her. Hugh's argument that the QDRO contains inconsistencies regarding the time when the Plan shall commence paying benefits to Joyce is without merit.

■ Another of Hugh's complaints is: "Under the [Plan], payments may not be made to an alternate payee upon request of the alternate payee or upon direction by a plan participant. Rather, both the [Plan] and the [Internal Revenue] Code require that benefits be paid to an alternate payee

only as directed in accordance with the specific provisions of a QDRO."

From this, we gather Hugh believes the Plan administrator would not be obliged to begin paying benefits to Joyce upon receiving notice from her that she is exercising her option under alternative "(3)" above. As we understand him, Hugh is saying any directive to the Plan administrator must come from the trial court in a QDRO, not from Joyce.

Assuming, without deciding, that Hugh is correct, his contention is not fatal to the QDRO. Section 452.330.5 reads:

The court's order as it affects distribution of martial property shall be a final order not subject to modification; provided, however, that orders intended to be qualified domestic relations orders affecting pension ... plans pursuant to the U.S. Internal Revenue Code shall be modifiable only for the purpose of establishing or maintaining the order as a qualified domestic relations order or to revise or conform its terms so as to effectuate the expressed intent of order.

The final paragraph of the QDRO in the instant case reads:

It is intended that this order shall qualify as a Qualified Domestic Relations Order under the Retirement Equity Act of 1984, P.L. 98–397. This Court retains jurisdiction to amend this Order only for the purpose of establishing or maintaining this Order as a Qualified Domestic Relations Order; that further, the Court may amend this Order to revise or conform its terms so as to effectuate the express provisions of this Order and the Decree of Dissolution of Marriage entered herein as well as any modification to said Decree.

If Joyce elects to begin receiving benefits under the Plan when Hugh attains an age at which he becomes eligible for benefits (even though he does not choose to begin drawing them), the trial court can modify the QDRO to recite such circumstances and provide that the share of the pension awarded Joyce shall be payable commencing then. We therefore reject Hugh's contention that the QDRO is inval-

id, and we likewise deny his argument that Joyce's share of the benefits should be payable only when he reaches age 65.

■ Hugh also asserts the QDRO does not satisfy 26 U.S.C.A. § 414(p)(2)(C) which requires that a QDRO clearly specify the number of payments or period to which it applies. We disagree. Paragraph 10 of the QDRO (quoted earlier) states the term of the regular monthly pension payments to Joyce "is for the life of the Participant." That is a definitely ascertainable period.

An alert reader will have borne in mind that the QDRO does not award Joyce a percentage of Hugh's pension benefits, but instead awards her a fixed amount—$1,000 per month. Obviously, the percentage of the pension benefits she receives will vary depending on when she begins receiving them.

Assuming (a) Hugh becomes eligible for pension benefits of $23,130 annually ($1,927.50 per month) at age 55, and (b) Joyce elects to begin drawing her $1,000 per month at that time, she will receive 51.9 percent of the amount to which Hugh would be entitled.

If Hugh becomes eligible for pension benefits of $30,623 annually ($2,551.92 per month) at age 60 and Joyce waits until then to begin drawing her $1,000 per month, she will receive only 39.2 percent of the amount to which Hugh would be entitled.

Of course, in the benefits-at-age-55 scenario, Joyce would have been married to Hugh 74.7 percent of the time during which the right to benefits was accruing under the Plan, while in the benefits-at-age-60 scenario, Joyce would have been married to Hugh only 63.6 percent of the time.

Additionally, the monthly benefits of $1,927.50 and $2,551.92 referred to above are based on the assumption that Hugh will receive no salary increase after December 31, 1989, an ultraconservative premise. Exhibit 2, set forth in part earlier, has projections of annual retirement income based on various percentages of salary growth. We have not shown those estimates in this opinion because the trial court relied on the zero-growth figures.

Finally, we find no contention in the argument portion of Hugh's brief that it was error to award Joyce a $1,000–per–month share of the pension benefits instead of a specified percentage of them. We therefore decline to comment on that subject. We note, however, that the $1,000–per–month award is to commence only when the right to benefits matures. Consequently, Joyce shares the risk that the pension will fail to mature. *See: Weiss v. Weiss,* 702 S.W.2d 948, 953 (Mo.App.1986); *Lynch,* 665 S.W.2d at 23.

Hugh's point IV, to the extent we have been able to grasp its import from the argument portion of his brief, is denied, and the amended decree of dissolution of marriage is affirmed.

PARRISH, C.J., and SHRUM, J., concur.